[No. B020257. Second Dist., Div. Four. Dec. 22, 1986.]

VICTOR METZENBAUM, Plaintiff and Appellant, v.
R.O.S. ASSOCIATES et al., Defendants and Respondents.

## COUNSEL

Jeanne M. Evans for Plaintiff and Appellant.

Burkley, Moore, Greenberg & Lyman and Richard W. Lyman, Jr., for Defendants and Respondents.

## OPINION

**ARGUELLES, J.**—Victor Metzenbaum (Metzenbaum or appellant), plaintiff in the underlying action for recovery of a commission as a mortgage loan broker, appeals from the judgment entered against him and in favor of R.O.S. Associates, Dwight E. Richardson, William H. O'Neill III, Larry A. Simmons, Sam Y. Shimoza, and John Sandling (collectively respondents) after the court granted respondents' motion for a directed verdict.

In this appeal we are asked to decide whether a mortgage loan broker may recover the commission which a property owner agreed to pay him under an exclusive brokerage contract when: (1) the owner breached the contract by entering into a similar agreement with another broker and accepting a loan through him; (2) the first broker was unaware of the breach until after the expiration of his contract; and (3) there was no evidence that the first broker either obtained or could have obtained an acceptable loan within the contract period. We conclude that when the owner's breach could not possibly have prevented the broker's performance within his contract period, the broker has failed to show that the owner's breach proximately caused him any damage and thus may not recover his commission as damages for the breach. We affirm the judgment.

FACTS

The relevant facts are not disputed. On September 9, 1983, respondent Dwight E. Richardson (Richardson), as a general partner in the partnership known as R.O.S. Associates (R.O.S.) and on its behalf, entered into a written agreement prepared by appellant, "irrevocably" appointing appellant for a 30-day period as its agent "with the sole and exclusive right to negotiate a loan commitment from a lender" on terms that included the following:

"The loan shall be in the amount of $1,800,000 [changed by interlineation to read, 'Borrower needs $1,850,000'] new money in a 'wraparound' type loan based on a first trust deed due American Savings & Loan in the amount of approximately $890,000.

"Payments on the loan shall be on the total money ($2,690,000 approx) . . . .

"The total point fee for said loan shall be 6 points, which shall include Two %, or $36,000 as a commission fee for METZENBAUM's services in securing said commitment. If a loan different in amount than the above described is accepted or agreed to by us then METZENBAUM's fees shall be pro-rated to the different loan.

"If a loan commitment through METZENBAUM or his contacts is secured on the terms hereinabove set forth, or on different terms accepted by us, and for any reason whatsoever on our part the loan is not consumated, we shall nevertheless pay METZENBAUM his fee when due as herein agreed upon.

"The undersigned expressly agree that METZENBAUM's services in procuring said commitment are fully performed and his fee is completely earned, due and payable at the time such commitment is issued. In the event action be instituted for the collection of said fee, we agree to pay all court costs and such sums as the court may fix as reasonable attorney's fee.

"Performance of this agreement shall be governed by and construed in accordance with the laws of the State of California, county of Los Angeles.

". . . . . . . . . . . . . . . . . . . .

"The undersigned further agree that for and in consideration of the contact made available to the undersigned by VICTOR METZENBAUM in his actions under this agreement, that for the next one (1) year from the date

hereof, the undersigned will pay VICTOR METZENBAUM a fee at the same rate as herein agreed upon, for any loan whatsoever from the lending or brokering source making a commitment under this agreement, in which the undersigned may in any way whatsoever be involved."

At the time the agreement was executed, R.O.S. had filed for bankruptcy and was subject to a time limitation in obtaining a mortgage loan on its property. In the interest of time, appellant introduced Richardson to a lender, Equitec, with whom appellant had already begun to work on the loan.

On September 15, 1983, an escrow was opened between Equitec and R.O.S. for $2.17 million. The terms of the escrow required Equitec to either fund the loan application or offer a different loan by October 5, 1983, but further provided that if a substantially and materially different loan were offered by Equitec, R.O.S. could reject it. Equitec did not fund the original loan application within the escrow period, but instead offered R.O.S. a new loan for $1,975,000, which R.O.S. rejected.

On September 30, R.O.S. entered into another exclusive written brokerage agreement with Frank Gordin of Mortgage Network, Inc. On October 3, Gordin's lender, Avco Investment Corporation, issued a loan commitment for $1.9 million, which R.O.S. accepted on October 6 and 7.

On October 8, appellant's exclusive brokerage contract with R.O.S. expired without his having procured any loan commitment acceptable to R.O.S. At the time his contract expired, appellant did not know that R.O.S. had entered into another exclusive brokerage agreement and had accepted a loan commitment obtained through that brokerage.

Even after R.O.S. accepted the Avco loan commitment, it encouraged appellant to continue working to procure an even larger loan commitment from Equitec than its previous $1,975,000 offer. Appellant's efforts on R.O.S.' behalf continued until October 22, when Equitec advised him that it would not commit to a higher loan than the one previously offered.

Upon learning several months later of the Avco loan, and the fact that it was obtained during the period of his exclusive brokerage agreement, appellant demanded his commission based on the last firm loan commitment by Equitec that R.O.S. rejected. R.O.S. refused to pay the commission, and appellant commenced the underlying action for compensatory and punitive damages on theories of breach of contract, fraud and deceit.

At the conclusion of the evidence at trial, respondents moved for a directed verdict. They argued that, as a matter of law, appellant was not

entitled to judgment because he had failed to prove that he had or could have performed under his exclusive agreement, even assuming that respondents breached the agreement by hiring another broker and accepting a loan commitment procured by that broker during the period of appellant's contract. Appellant also moved for a directed verdict on the breach of contract theory. The trial court denied appellant's motion, granted respondents' motion, and directed the jury to enter a verdict in respondents' favor, which it did. Judgment was entered on the directed verdict, and this appeal followed.

## CONTENTIONS

Appellant contends that the trial court reversibly erred in directing a verdict in respondents' favor because: (1) clear evidentiary conflict existed as to the exclusivity of appellant's contract and his negotiations with Equitec; and (2) no evidentiary conflict existed as to the fact that respondents were working with another loan broker during the exclusive period of appellant's contract. Appellant further contends that the court reversibly erred by denying his motion for directed verdict because he was entitled to judgment in his favor on the issue of compensatory damages.

## DISCUSSION

"A motion for directed verdict, like a motion for nonsuit, is in the nature of a demurrer to the evidence. [Citation.]" (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 408, p. 411.)

"A directed verdict may be granted against a plaintiff '. . . "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled,. . . indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." [Citations.] *Unless it can be said as a matter of law . . . no other reasonable conclusion is legally deducible from the evidence . . . the trial court is not justified in taking the case from the jury.*' (Italics added.) [Citations.] [¶] The function of a trial court in ruling on a motion for a directed verdict is analogous to that of a reviewing court in determining on appeal whether there is evidence in the record of sufficient substance to support the verdict or judgment. *In considering the motion, the trial court may not weigh or consider conflicting evidence or judge the credibility of witness [sic].* [Citations.]" (*Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 395 [196 Cal.Rptr. 117].)

Appellant opines that the trial court erred in its ruling on the directed verdict motions because it misunderstood appellant's theory of

recovery. Appellant explains that he sought recovery of *damages for breach* of the agreement which occurred when respondents procured and accepted a loan through another broker within the period of appellant's exclusive brokerage, thus making appellant's *performance* within the remaining contract period *impossible*. However, appellant argues, the trial court apparently believed he sought recovery of an earned commission under the terms of the exclusive brokerage agreement after appellant had done all that was required of him by the agreement.

Portions of the record at first glance appear to lend some support to appellant's opinion.

At the hearing on the motions for directed verdict, the colloquy between appellant's counsel and the trial court included the following:

"THE COURT: . . . I don't think I am in any doubt as to what his damages are if there has been a breach of contract or what the compensatory damages are if there has been a fraudulent promise made without the intent to perform. What he was deprived of was the benefit of his agreement to get a commission in the amount of 2 percent of the loan.

"Ms. EVANS: That's correct, your Honor.

"THE COURT: I don't think there is any question that that is his damages, but *I am not going to conclude as a matter of law that that has been established because that would require me to conclude that he has performed.*

"Ms. EVANS: Not according to the—

"THE COURT: Do you think he is entitled—by 'perform,' I mean do you think he is entitled to his commission if neither of the Equitec letters of October 3rd or October 11th are within his contract, he is entitled to be paid just because they went to another lender during the thirty-day period? Can you answer that question, is that your theory or did I misunderstand you?

"Ms. EVANS: Not quite. If they had not interfered with this contract, let's say they had not entered into a contract with another broker on September 30th, if they had not accepted a commitment from another lender during the exclusivity period of plaintiff's contract, I would say he has no case because he couldn't perform under the conditions set in his contract as altered by the defendant. [¶] But they did interfere with his exclusivity period, so therefore *the issue is not whether he produced a commitment*

*pursuant to the contract, but the issue is damages for breach of the contract.* And that's—

"THE COURT: The only evidence here as I said once before, the only evidence there is of his performance possibly or actual is Equitec. And Equitec either met the conditions of his agreement or it did not. *There is no evidence that he was able to perform with any other lenders.*

"
. . . . . . . . . . . . . . . . . . .

"THE COURT: Assume Never versus King [*Never* v. *King* (1969) 276 Cal.App.2d 461 (81 Cal.Rptr. 161)] teaches us that—*assume that the going to another broker was a breach,* assume that is true. And assume that as a result, that is a breach or repudiation of his agreement, the defendant's agreement with your client. *That does not relieve your client of the burden of proving that he in fact has either performed or that the lender produced would perform so that he could show that he is entitled to the commission.*" (Italics added.)

■■■■■ The parties to the appeal agree and the agreement between them expressly provides, that they contracted for an "exclusive" rather than a "general" or "open" loan brokerage agreement.[1]

■ "Where a valid listing contract exists between broker and seller, it is that agreement from which the broker's rights and duties arise. (See *Baumgartner* v. *Meek* (1954) 126 Cal.App.2d 505, 508-509 [272 P.2d 552].)" (*Seck* v. *Foulks* (1972) 25 Cal.App.3d 556, 569 [102 Cal.Rptr. 170]; see *Blank* v. *Borden* (1974) 11 Cal.3d 963, 969 [115 Cal.Rptr. 31, 524 P.2d 127].)

■ "Exclusive listing agreements are of two types. [Citation.] An 'exclusive agency' agreement is interpreted as prohibiting the owner from selling the property through the agency of another broker during the listing period [citation], but the owner may sell the property through his own efforts. [Citations.] However, an 'exclusive right to sell' agreement (exclusive sales

---

[1]Three commonly used types of listing agreements are (1) the exclusive right to sell, (2) the exclusive agency listing, and (3) the general or open listing. (*Coldwell Banker & Co.* v. *Pepper Tree Office Center Associates* (1980) 106 Cal.App.3d 272, 278, fn. 3 [165 Cal.Rptr. 51]; Cal. Real Property Sales Transactions (Cont.Ed.Bar 1981) The Broker, § 2.58, p. 112 (hereinafter cited as CEB.) ". . . The three listings are distinguished by the conditions that must be fulfilled under each for the broker to earn the commission. None of these common types of listing agreements need be used; the rights of the parties are determined by the provisions actually included in their contract. It is the contents of the agreement and not its title that will be considered controlling by the courts. See, *e.g., Tetrick* v *Sloan, supra; Coleman* v *Mora* (1968) 263 CA2d 137, 69 CR 166." (CEB § 2.58, p. 112.)

contract) prohibits the owner from selling both personally [citations] and through another broker [citation], without incurring liability for a commission to the original broker. [Citations.] *In the event the owner breaches this type of agreement, he is liable for the commission* which would have accrued if the broker had procured a purchaser during the period of the listing. [Citation.] *The broker need not show that he could have performed by tendering a satisfactory buyer* [citation], *or that he was the procuring cause of the sale.* [Citation.] The owner may breach the agreement by negotiating a sale in violation of the agreement [citation] or by action which renders the broker's performance impossible. [Citation.]" (*Carlsen* v. *Zane* (1968) 261 Cal. App.2d 399, 401-402 [67 Cal.Rptr. 747], italics added; accord *Coldwell Banker & Co.* v. *Pepper Tree Office Center Associates, supra,* 106 Cal.App.3d at p. 278, fn. 3.)

The undisputed facts before the trial court revealed (1) that respondents accepted the Avco loan commitment within the period of appellant's exclusive brokerage and (2) that the Avco loan commitment was procured by another broker with whom respondents had entered into an exclusive loan brokerage agreement. Thus, the "exclusive" brokerage agreement was breached by respondents regardless of whether that agreement is characterized as an "exclusive agency" or an "exclusive right to sell [procure loan]" type of agreement because the loan commitment that respondents accepted was procured by a broker rather than by respondents themselves.

Under appellant's theory, respondents wrongfully deprived him of the opportunity to procure a loan acceptable to them during the last two to three days of the contract term by breaching the brokerage agreement. (See *Charles B. Webster Real Estate* v. *Rickard* (1971) 21 Cal.App.3d 612, 615-616 [98 Cal.Rptr. 559].)

Having determined that respondents breached their agreement with appellant, as opposed to merely refusing to pay an earned commission, appellant's view of the applicable measure of damages may be summarized as follows: "Under an exclusive agency listing, the broker is the only agent authorized to procure offers for the purchase of the property, and is entitled to a commission even if the property is sold by another broker. *Fleming* v *Dolfin* (1931) 214 C 269, 4 P2d 776; *Carlsen* v *Zane* (1968) 261 CA2d 399, 67 CR 747." (CEB § 2.61, p. 116.)

This statement of the law, however, is deceptively simple. (6) In breach of contract actions, damages cannot be *presumed* to flow from liability. "It is essential to establish a *causal connection* between the breach and the damages sought. [Citations.]" (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 638, p. 542, italics added.) This rule has been codified

in Civil Code section 3300, which reads: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the *detriment proximately caused* thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Italics added.)

Ordinarily, the issue of causation is a question of fact for the jury. (*State Farm Mut. Auto. Ins. Co.* v. *Allstate Ins. Co.* (1970) 9 Cal.App.3d 508, 529 [88 Cal.Rptr. 246]; see *Better Food Mkts.* v. *Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179, 183 [253 P.2d 10, 42 A.L.R.2d 580].) However, under the principles applicable to directed verdict motions, if there is no substantial evidence to support a verdict in plaintiff's favor if such a verdict were given, and no other reasonable conclusion is legally deducible from the evidence, the trial court is entitled to decide the issue as a matter of law. (*Hilliard* v. *A. H. Robins Co., supra,* 148 Cal.App.3d 374, 395.)

The record before us reflects the trial court's explicit finding that, even assuming respondents breached their agreement with appellant, no substantial evidence had been produced to show that respondents' actions interfered with appellant's ability to procure a loan from Equitec within the last few days of his contract period. Indeed, the evidence showed that Equitec's refusal to provide a loan commitment that met respondents' requirements rendered appellant's performance impossible.

In support of his contention that an evidentiary conflict existed on the issue of the exclusivity of his contract with R.O.S., appellant argues that the trial court's directed verdict decision reflected its erroneous factual finding that appellant's contract was exclusive only as to one lender, Equitec, contrary to the express contractual provisions that irrevocably appointed appellant as respondents' agent "with the sole and exclusive right to negotiate *a loan commitment from a lender"* on specified terms (italics added).

Even if true, this was no error.

"It is solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. [Citation.] Once the facts are determined, or where there is no conflict in the extrinsic evidence, the interpretation of a contract in the light of those facts is a question of law. [Citation.]" (*United California Bank* v. *Maltzman* (1974) 44 Cal.App.3d 41, 49 [118 Cal.Rptr. 299]; *O'Connor Bros. Abalone Co.* v. *Brando* (1974) 40 Cal.App.3d 90, 95 [114 Cal.Rptr. 773].)

Appellant admits in his opening brief that his contract with R.O.S. was "clear and concise on its face." In light of the unrebutted evidence that Equitec was the only lender with which appellant negotiated or intended to negotiate during the entire period of his brokerage agreement, the trial court did not err in interpreting the contractual term "a lender" to refer only to Equitec as a matter of law for purposes of deciding the directed verdict motions.[2]

Thus, the impossibility of appellant's procuring an acceptable loan from Equitec within his contract period, rather than respondents' breach of that contract, proximately caused appellant's damages as measured by his loss of a commission.

Never v. King (1969) 276 Cal. App.2d 461 [81 Cal.Rptr. 161], upon which both parties rely, is analogous. In Never, as here, plaintiff was a real estate and mortgage loan broker who "appealed from a judgment entered on a directed verdict which denied him any compensation or damages from defendants who had given him the exclusive right to negotiate for a loan on their behalf" for the purpose of financing building construction. (At p. 462.) Within the period of broker Never's exclusive brokerage agreement, defendant King and others entered into another brokerage agreement for the same type of loan described in Never's agreement. (At p. 465.) King advised Never that he had " 'sought and obtained financing elsewhere.' " (Id., at p. 466.) At no time during the period of his agreement did Never submit a loan offer to King that met the requirements stated in the agreement. (Id., at p. 467.) Like the trial court here, the trial court in Never granted the breaching defendants' motion for directed verdict on the ground that Never had failed to show by substantial evidence that he performed or could have performed under the agreement. (At pp. 470-471.) On appeal from the judgment, Never relied "upon principles which have been developed and applied in connection with contracts giving an exclusive agency, or an exclusive right to sell or lease real property," contending that he was "entitled to damages measured by the commissions set forth in the contract." (Ibid.) Rejecting this contention, the reviewing court held that, although "plaintiff would be relieved of further performance or tender of performance by defendants' breach," Never was "not thereby relieved of proof of his damages. In the absence of any evidence to show that plaintiff could have earned his commission but for defendants' repudiation, the court properly directed a verdict for the defendants." (At p. 471, italics added.) The appel-

---

[2]At one point in the hearing on the motions, the trial court commented on the evidence concerning appellant's performance and ability to perform as follows: ". . . the only evidence there is of his performance possibly or actual is Equitec. And Equitec either met the conditions of his agreement or it did not. There is no evidence that he was able to perform with any other lenders."

late court concluded: ". . . There is no evidence that such a loan was or ever could have been obtained. From all that appears in the record, plaintiff undertook the impossible. Under these circumstances his performance was not prevented by defendants' breach, and *no damages flowing from that breach have been established.* The trial court properly directed a verdict for the defendants." (At p. 479, italics added.)

We reach the same conclusion here, and for the same reasons expressed by the *Never* court. In the present matter, the trial court did not misunderstand appellant's theory of recovery. To the contrary, appellant did not understand that the trial court's ruling was based on appellant's failure to produce substantial evidence that respondents' breach *caused* his loss of commission.

We wish to emphasize, however, that the view expressed here is limited to the peculiar facts presented here and that the issue of causation should ordinarily be left to the trier of fact. Only the particular circumstances under which respondents' breach occurred here—with only a few days remaining before expiration of appellant's exclusive contract period, and with appellant's ignorance of respondents' actions coupled with his certain failure as to the only lender he had negotiated with and intended to negotiate with under the agreement—justified taking the causation issue from the jury and, instead, directing a verdict in respondents' favor. Furthermore, lest we in any way be misunderstood, we do not condone the practice of surreptitiously breaching exclusive brokerage agreements in order to avoid a contractual obligation to pay a commission, and we admonish those who enter such agreements that the courts will not countenance such a practice.

In light of the views we have expressed, we find it unnecessary to discuss appellant's remaining contention.

■ We turn our attention to respondents' contentions that they are entitled to sanctions for appellant's frivolous appeal as well as additional attorney's fees and costs on appeal pursuant to Civil Code section 1717 and rule 26 of the California Rules of Court.

We deny the request for sanctions because we do not find that the appeal is frivolous. First, respondents fail to show affirmatively any facts suggesting that appellant took the appeal solely for the purpose of delay or for any other improper purpose. Second, as our discussion reflects, the issues presented here were not susceptible of quick and easy resolution, and we cannot say that "any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].)

As to respondents' claimed entitlement to attorney's fees, we note that the trial court apparently was inclined to award respondents attorney's fees pursuant to Civil Code section 1717, although the record does not contain any order for such an award or indicate its amount. ▉ Of course, the contractual provision for attorney's fees found in the brokerage agreement between the parties would support an award of attorney's fees both at trial and on appeal. (*Security Pacific National Bank* v. *Adamo* (1983) 142 Cal.App.3d 492, 498 [191 Cal. Rptr. 134].) Accordingly, we follow the practice of allowing the trial court to determine the amount of such fees when it determines costs on appeal. (*Ibid.;* Cal. Rules of Court, rule 26(a).)

## DISPOSITION

The judgment is affirmed and remanded to the trial court with directions to determine, in addition to respondents' costs on appeal, the amount of attorney's fees to be awarded respondents for legal services rendered on this appeal.

Kingsley, Acting P. J., and McClosky, J., concurred.

A petition for a rehearing was denied January 16, 1987, and appellant's petition for review by the Supreme Court was denied March 17, 1987.