[No. A079518. First Dist., Div. Three. May 26, 1999.]

DENIS B. HOWARD et al., Plaintiffs and Appellants, v. OWENS CORNING, Defendant and Respondent.

**COUNSEL**

Brayton, Purcell, Curtis & Geagan, Brayton Harley Curtis, Philip A. Harley, James L. Oberman, Timothy J. Walton, James Geagan, Diane L. Abraham and Claudia Martin for Plaintiffs and Appellants.

Brobeck, Phleger & Harrison, Thomas M. Peterson and Brett M. Schuman for Defendant and Respondent.

## OPINION

**McGUINESS, P. J.**—This appeal arises from a lawsuit alleging permanent personal injuries arising from exposure to asbestos and products containing asbestos. Denis B. Howard (Howard) and Malee C. Howard (collectively appellants) appeal a special jury verdict for respondent Owens Corning[1] finding that Howard's exposure to asbestos was not a cause of injury, damage, loss or harm to him. Appellants contend the trial court erred in denying a directed verdict in their favor, and there was insufficient evidence as a matter of law to support the jury verdict for Owens Corning. We affirm the judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Howard and his wife filed the instant lawsuit in March 1995. The complaint alleged seven causes of action based on various theories including negligence, strict liability, emotional distress, intentional tort, conspiracy and loss of consortium; and sought general, special and punitive damages against no fewer than 215 named defendants and 300 unnamed does. Specifically, the complaint alleged that as a result of his exposure to asbestos and asbestos-containing products while employed by the United States Navy and Army between 1960 and 1989, Howard had suffered "severe and permanent injury . . . including, but not limited to breathing difficulties, asbestosis, lung and/or other cancer, mesothelioma, and/or other lung damage"; and that the defendants "knew, or should have known, and intended" that their asbestos-containing products would suffer deterioration or be put to uses which would result in the release of airborne asbestos fibers foreseeably causing damage to persons like Howard.

For administrative purposes, Howard's lawsuit was grouped together with a number of other asbestos personal injury cases, collectively captioned *In re Brayton Group 115*, and proceeded to trial against Owens Corning alone.

Howard was born in October 1942. He enlisted in the United States Navy in 1960, soon after graduation from high school. At trial, Howard testified in detail to his occupational history, including his alleged exposure to asbestos. From 1960 until 1963, Howard was engaged in land-based basic training, classroom training in antisubmarine warfare, and assignment to service at Pearl Harbor, Hawaii, as a torpedoman's mate. His duties included cleaning and maintenance of torpedoes and delivery of torpedoes to ships stationed at Pearl Harbor. Howard testified that during this period his shipboard work

---

[1]Howard's original personal injury complaint sued respondent Owens Corning under the company's former name of Owens-Corning Fiberglas Corporation. Throughout this litigation, the parties have referred to Owens Corning under its new name.

was on the main deck; he had no occasion to go below deck or into engine or boiler rooms, and was not involved in any ship overhauls. He could not testify that he had any exposure to asbestos with respect to this period of time.

In September 1963, Howard was transferred to service aboard the USS Piedmont, on which he was stationed until June 1965, first as a torpedoman's mate, and later as a clerk. During this period Howard lived aboard ship. The Piedmont was a repair vessel that provided repair services to destroyers home-ported in San Diego. On several occasions, when Howard passed through the ship's machine shop he observed men "working on, what looked to me to be pipes with insulation, and there would be dust in the air . . . ." However, he never had occasion to go to the machinery, engine or boiler rooms of the Piedmont. Howard slept in a berthing compartment, with "some" insulated pipes running overhead above the top bunks. "[P]eriodically" Howard would find "dust or other material" on his bed following work done in the area above his bunk.

Howard left the Piedmont in June 1965. For several months, he was trained in Florida as a communications technician. In December 1965, the Navy ordered him to Japan to serve in electronics intelligence. From January to September 1966, Howard was assigned to the USS Kiersage, on which he participated in conducting antisubmarine warfare exercises. During this time period, Howard never went into a boiler room or engine room, and was not in the vicinity of any insulation work. Most of Howard's work was performed in a radio room ventilated with fresh air.

In September 1966, Howard was transferred to San Miguel in the Philippines, where he served until December 1967 as an intelligence technician on a number of different ships in the 7th Fleet. During these deployments, Howard lived in the berthing quarters and worked in the communications areas of the ships. On some ships, Howard's working area was above deck; on others it was below. The below-deck working areas were ventilated. His experience on these ships was similar to that he had had on the Kiersage. Howard did not testify to any suspected exposure to asbestos during this time period.

After additional classroom instruction and torpedo training between January and April 1969, Howard was assigned to the USS Weiss, where he served as a bosun's mate or immediate supervisor of the above deck forces. When the decision was made in the late summer of 1969 to decommission the Weiss, Howard supervised the work involved in the decommissioning

process.[2] As part of his duties, Howard had occasion to walk through areas of the ship, including the boiler and engine rooms, where insulation was being removed by other seamen. Howard testified that there was "evident dust" visible "on many occasions" during this process.

In late November 1969, Howard was transferred from the Weiss to his last ship, the USS Current, on which he served as a bosun's mate until the end of March 1970. Howard did not testify to any suspected asbestos exposure on board the Current. He was discharged from the Navy in April 1970 after almost 10 years of service. Howard testified that during the entire period he was in the Navy, he never removed, applied, installed or worked directly with any material that he thought contained asbestos.

Five weeks after leaving the Navy, Howard enlisted in the United States Army. He served in the Army another 10 years, performing noncombatant duties in Alaska, Vietnam, Thailand, South Carolina and Panama. To the best of his knowledge, Howard was not exposed to any asbestos or asbestos-containing products during the entire time he served in the Army. After retiring from the Army in August 1980, Howard obtained a college degree and went into federal civil service. In August 1989, he applied for and obtained disability retirement based on his health. Howard testified that he was not exposed to asbestos either in college or while working in the civil service.

Howard testified that he began smoking cigarettes around the age of 11 or 12. Since the age of 17, he had been smoking at least 2 packs of unfiltered Camels cigarettes every day. Although he quit on three separate occasions for periods of approximately six months each, most recently following his surgery for lung cancer, Howard nevertheless resumed each time. As of the time of trial, Howard was still smoking approximately two packs of unfiltered cigarettes a day, as he had for forty years.

None of Howard's personal treating physicians testified on his behalf at trial. Instead, he offered the testimony of two expert witnesses. Dr. Carolyn Ray, an internist, testified that she examined Howard once, on October 16, 1995. At the time, Howard complained of shortness of breath, inability to climb stairs, and extremely limited ability to engage in other physical activities. Based on this physical examination, Howard's statements to her, pulmonary-function testing, and examination of Howard's medical records and a chest X-ray showing bilateral pleural thickening with plaques,

---

[2]Howard defined decommissioning as follows: "The ship would be removed from the active fleet of the U.S. Navy and placed in the reserve-fleet storage for a period of time until she was either needed or sold for scrap."

Dr. Ray diagnosed Howard as suffering from asbestosis and asbestos-related pleural disease caused by his exposure to asbestos during his service in the Navy. Dr. Ray also diagnosed Howard's lung cancer as asbestos-related.

Dr. Ray testified that pathological testing of actual lung tissue was "the ultimate or the gold standard" of tests for diagnosing asbestosis. Nevertheless, Howard did not introduce any pathological evidence at trial and, instead, relied on clinical diagnoses. Dr. Ray testified there were two "absolute requirements" for any clinical (as opposed to pathological) diagnosis of asbestosis: (1) some history of a "significant exposure to asbestos"; and (2) a minimum "reasonable" amount of time—"generally 20 years"—between the first exposure to asbestos and the date of the clinical evaluation. Dr. Ray testified that during Howard's single interview with her in October 1995, he described an occupational history of "significant and heavy" asbestos exposure over a period of 10 years, during which time he personally worked at removing asbestos-containing insulation, ripping out asbestos-containing pipe wrapping, and in a Navy machine shop in conditions "like walking in a snowstorm . . . ." Dr. Ray had not heard Howard's own trial testimony describing his occupational history.

On cross-examination, Dr. Ray acknowledged that Howard had a history of lung disease in this family, and suffered from a large number of chronic disorders and diseases unrelated to asbestos exposure. Based on all the testimony in the record, these conditions include: chronic obstructive lung disease, emphysema, degenerative joint disease, gastritis, heart arhythmia, heart disease, sleep apnea, liver disease, chronic edema, arthritis, bursitis, diabetes, gout, granulomatous disease caused by previous exposure to tuberculosis, and morbid obesity. Howard's father died at age 54 of chronic lung disease, and his mother died at age 69 of lung cancer. Dr. Ray acknowledged that there is a genetic component in the development of lung cancer. Dr. Ray also acknowledged that she was not currently certified in the commonly accepted system used to read, grade, and make diagnoses of occupational pulmonary disease from chest X-rays.

Howard's other expert witness was Dr. Allan Smith, an epidemiologist. Dr. Smith testified that asbestos exposure significantly increases the risk of lung cancer in nonsmokers, but increases the same risk exponentially for cigarette smokers. On direct examination, Dr. Smith was asked to assume that Howard had suffered "substantial exposure" to asbestos while on board ship in the Navy, had been diagnosed as suffering from asbestos, and had also "smoked heavily" most of his life. Based on these assumptions, Dr. Smith testified to his opinion that both the smoking and the exposure to asbestos had contributed to causing Howard's lung cancer.

On cross-examination, Dr. Smith admitted that (a) the minimum threshold amount of asbestos exposure necessary before developing asbestosis was unknown; (b) virtually everyone has some "background" exposure to asbestos; and (c) there is no reason to believe such background exposure would cause asbestosis. Asked whether his opinion of the cause of Howard's lung cancer would change on the basis of evidence Howard's only contact with asbestos beyond normal background exposure had been during a two-month period when he had intermittently walked through an area where other persons were performing work with asbestos-containing insulation, Dr. Smith testified "it would change my answer. I guess it would become a question." However he reiterated his opinion that "the asbestos caused the lung cancer," based on the assumption Howard's chest X-ray provided evidence of asbestos exposure.

Owens Corning's trial counsel failed to file a timely designation of expert witnesses or tender expert reports to Howard's counsel. The trial court denied Owens Corning's motion to submit its expert witness list, and granted Howard's cross-motion to exclude any testimony from Owens Corning's experts. Owens Corning was therefore barred from introducing any expert witness testimony at trial.

After the defense rested, Howard's trial counsel moved for a directed verdict finding that Howard had suffered damage, loss or harm from exposure to asbestos. He argued "there is no defense expert testimony whatsoever" to counter either Dr. Ray's diagnosis of asbestosis, asbestos-related pleural disease and asbestos-related lung cancer or Dr. Smith's expert opinion that Howard's lung cancer was caused by exposure to asbestos. The trial court denied the motion on the ground the jury could disregard or reject the expert testimony offered on behalf of Howard if there was any reasonable basis to do so, such as a finding that there was insufficient factual foundation for the expert testimony, Dr. Ray's diagnosis was suspect because of her lack of current technical certification in reading X-rays, or the expert testimony was neither impartial nor unbiased.

The trial court instructed the jury on expert testimony in accordance with BAJI Nos. 2.40, 2.41 and 2.42.[3] The jury returned a special verdict in favor of Owens Corning finding that Howard's exposure to asbestos was not "a cause of injury, damage, loss or harm" to him. Judgment was entered in favor of Owens Corning. Howard moved for a new trial, contending the jury

---

[3]The trial court instructed the jury in accordance with the 1995 revision of BAJI No. 2.40 as follows: "Expert testimony: witnesses who have special knowledge, skill, experience, training, or education in a particular subject have testified to certain opinions. Any such witness is referred to as an expert witness. In determining what weight to give any such

was required to accept the opinions of his expert witnesses. After oral argument, the trial court denied the motion.[4] This appeal followed.

## II. STANDARD OF REVIEW

On appeal, Howard argues the trial court erred in denying him a directed verdict based on the expert witness testimony that he is suffering from asbestos-related illnesses. Because Owens Corning presented no expert witness testimony of its own, leaving Howard's own expert witness testimony uncontradicted, Howard contends there was no evidence either to justify the denial of a directed verdict in his favor, or to support the jury's ultimate verdict for Owens Corning. Howard is wrong.

Like a motion for nonsuit, a motion for a directed verdict is in the nature of a demurrer to the evidence. (*Walters* v. *Bank of America* (1937) 9 Cal.2d 46, 49 [69 P.2d 839, 110 A.L.R. 1259]; *Metzenbaum* v. *R.O.S. Associates* (1986) 188 Cal.App.3d 202, 208 [232 Cal.Rptr. 741]; *Fuchs* v. *Southern Pac. Co.* (1935) 5 Cal.App.2d 409, 412 [42 P.2d 704]; 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 430, p. 491.) In determining such a motion, the trial court has no power to weigh the evidence, and may not consider the credibility of witnesses. It may not grant a directed verdict where there is *any* substantial conflict in the evidence. (7 Witkin, Cal. Procedure, *supra*, Trial, §§ 419, 431-432, pp. 480-481, 492-494.) A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there

---

opinion, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reason for each opinion.

"An opinion is only as good as the facts and reasons on which it is based. If you find that any such fact has not been proved or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based.

"You are not bound by an opinion. Give each opinion the weight you find it deserves. However, you may not arbitrarily or unreasonably disregard the expert testimony in this case."

[4]In its order denying the motion for a new trial, the trial court stated: "The Court has weighed the evidence regarding Howard's exposure to asbestos in his Navy career . . . and his smoking history . . . . Howard was on navy ships which had asbestos containing insulation. But he was never present during 'rip-outs' nor, given his craft, had he any exposure in engine rooms. [¶] He smoked two to three packs of cigarettes a day for 40 years, including the period following a one-year hiatus in 1984. [¶] Although the expert testimony was that he had asbestos related disease as well as cigarette related disease, the foundational evidence for that opinion was not sufficiently weighty as to compel a conclusion that the jury 'clearly should have reached a different verdict . . .' [citation]. [¶] For the foregoing reasons, the motion of plaintiff Howard for a new trial is hereby DENIED."

is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. (*Casey* v. *Proctor* (1963) 59 Cal.2d 97, 103 [28 Cal.Rptr. 307, 378 P.2d 579]; *Walters* v. *Bank of America, supra,* 9 Cal.2d at p. 49; *Estate of Lances* (1932) 216 Cal. 397, 400-401 [14 P.2d 768]; *Shapiro* v. *Hu* (1986) 188 Cal.App.3d 324, 334 [233 Cal.Rptr. 470]; *Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 394-395 [196 Cal.Rptr. 117]; *Grafton* v. *Mollica* (1965) 231 Cal.App.2d 860, 862 [42 Cal.Rptr. 306]; *Estate of Easton* (1931) 118 Cal.App. 659, 662 [5 P.2d 635]; 7 Witkin, Cal. Procedure, *supra,* Trial, §§ 419, 431-432, pp. 480-481, 492-494.)[5]

Thus, if the party resisting a motion for directed verdict produces sufficient evidence to support a jury verdict in his or her favor, the motion must be denied. In this case, of course, the jury found in Owens Corning's favor at the conclusion of trial. Howard's assertion that he was "unfairly denied a directed verdict" is therefore functionally equivalent to contending there was insufficient evidence to support the jury verdict against him. Only if there was *no* substantial evidence in support of the verdict could it have been error for the trial court earlier to have denied Howard's motion for directed verdict. (*Grafton* v. *Mollica, supra,* 231 Cal.App.2d at p. 862.)

■ Our consideration of the issue whether the judgment was supported by substantial evidence is governed by the well-established standard of review applicable to any claim that a judgment or finding is not supported by the evidence in the record. Under that standard, we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121]; *County of Mariposa* v. *Yosemite West Associates* (1988) 202 Cal.App.3d 791, 807 [248 Cal.Rptr. 778]; *Chodos* v. *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 97 [178 Cal.Rptr. 831]; 9 Witkin, Cal. Procedure, *supra,* Appeal, § 359, pp. 408-410.)

■ It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a

---

[5]"It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] Unless it can be said as a matter of law that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. [Citation.]" (*Estate of Lances, supra,* 216 Cal. at p. 400.)

determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment. (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *Estate of Teel* (1944) 25 Cal.2d 520, 526-527 [154 P.2d 384]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *County of Mariposa* v. *Yosemite West Associates, supra,* 202 Cal.App.3d at p. 807; *Henry* v. *Sharma* (1984) 154 Cal.App.3d 665, 670 [201 Cal.Rptr. 478]; *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925]; *McKinney* v. *Kull* (1981) 118 Cal.App.3d 951, 955 [173 Cal.Rptr. 696].)

We emphasize that the test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing. (*Campbell* v. *Southern Pacific Co., supra,* 22 Cal.3d at p. 60; *County of Mariposa* v. *Yosemite West Associates, supra,* 202 Cal.App.3d at p. 807; *Chodos* v. *Insurance Co. of North America, supra,* 126 Cal.App.3d at p. 97; 9 Witkin, Cal. Procedure, *supra,* Appeal, §§ 359-364, pp. 408-415.) In short, even if the judgment of the trial court is against the weight of the evidence, we are bound to uphold it so long as the record is free from prejudicial error and the judgment is supported by evidence which is "substantial," that is, of " 'ponderable legal significance,' " " 'reasonable in nature, credible, and of solid value . . . .' " (*United Professional Planning, Inc.* v. *Superior Court* (1970) 9 Cal.App.3d 377, 392-393 [88 Cal.Rptr. 551]; *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; 9 Witkin, Cal. Procedure, *supra,* Appeal, §§ 359-364, pp. 408-415.)

## III. Discussion

█ Both in their briefs on appeal and at oral argument, appellants have strenuously maintained that the jury was *required* to accept his experts' diagnosis of asbestosis, asbestos-related pleural disease and asbestos-related

lung cancer to the extent it was based on Dr. Ray's examination of Howard's chest X-rays, because this evidence was *uncontroverted*, concerned a matter that was within the knowledge of experts only, and was not within the scope of common knowledge. Appellants do not stop here, however. They go so far as to argue that, as a matter or law, "[i]t is only when there is a conflict between expert testimony and the facts of the case, that the jury may determine the relative weight of the evidence. But when the expert testimony is uncontroverted, and no conflict exists, as here, the '*uncontroverted testimony* upon matters of expert knowledge is *conclusive.*'" (Italics in original, fns. omitted.) In support of this assertion, appellants cite two cases involving alleged professional negligence or malpractice (*Osborn* v. *Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 277 [7 Cal.Rptr.2d 101]; *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 313 [136 Cal.Rptr. 603]), and several older negligence cases (*Mittelman* v. *Seifert* (1971) 17 Cal.App.3d 51, 69 [94 Cal.Rptr. 654]; *Liberty Mut. Ins. Co.* v. *Industrial Acc. Com.* (1948) 33 Cal.2d 89, 94 [199 P.2d 302]; *Lindsay* v. *County of San Diego Ret. Bd.* (1964) 231 Cal.App.2d 156, 160 [41 Cal.Rptr. 737]).

Appellants have seriously misstated the law. A careful examination of the cases they cite reveals that the stated principle—uncontroverted expert opinion testimony may be "conclusive" on the jury—is actually the "single exception" to the general rule that "expert testimony, like any other, may be rejected by the trier of fact, so long as the rejection is not arbitrary." (*Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 507-510 [30 Cal.Rptr.2d 542].) Thus, "[a]s a general rule, '[p]rovided the trier of fact does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted. [Citations.]' [Citation.] This rule is applied equally to expert witnesses." (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 890 [92 Cal.Rptr. 162, 479 P.2d 362].) The *exceptional* principle requiring a fact finder to accept uncontradicted expert testimony as conclusive applies *only* in professional negligence cases where the standard of care must be established by expert testimony. In such instances, "the plaintiff must prove by members of the defendant's profession the standard of care or skill ordinarily used in the practice of that profession at a particular place" (*Liberty Mut. Ins. Co.* v. *Industrial Acc. Com., supra,* 33 Cal.2d at p. 95); only *then* may this "standard of care, when testified to by experts who are uncontradicted, . . . be conclusively shown by such testimony." (*Conservatorship of McKeown, supra,* 25 Cal.App.4th at p. 509.)[6]

Because the instant case does not present any issues of professional negligence or medical malpractice, there was no reason to require the trier of

---

[6]As the Supreme Court has stated, "[t]he reason for the exception [in malpractice cases] is obvious. Only physicians who practice their profession at a particular place could have any knowledge of the method of treatment customarily used by the other members of the profession practicing there; the subject, therefore, calls for expert opinion only. But the

fact to accept as "conclusive" the uncontradicted testimony of appellants' experts. Instead, the general rule applies. Under this rule, as the trial court correctly instructed the jury, the opinion of any expert witness "is only as good as the facts and reasons on which it is based. . . ." (BAJI No. 2.40.) If the jury finds that the party offering expert testimony has failed to prove any foundational fact, or that some fact on which the expert's opinion is based has been disproved by the opposing party, the jury is required to consider that in evaluating the expert testimony. Although a jury may not arbitrarily or unreasonably disregard the testimony of an expert, it is not bound by the expert's opinion. Instead, it must give to each opinion the weight which it finds that opinion deserves. So long as it does not do so arbitrarily, a jury may entirely reject the testimony of a plaintiff's expert, even where the defendant does not call any opposing expert and the expert testimony is not contradicted. (BAJI No. 2.40; *Foreman & Clark Corp.* v. *Fallon, supra,* 3 Cal.3d at p. 890; *Conservatorship of McKeown, supra,* 25 Cal.App.4th at pp. 507-510; *Lubetzky* v. *Friedman* (1991) 228 Cal.App.3d 35, 40 [278 Cal.Rptr. 706]; *Beard* v. *David* (1960) 179 Cal.App.2d 175, 177-178 [3 Cal.Rptr. 651] [testimony of plaintiff's expert was not conclusive, but was to be weighed by jury]; *Ortzman* v. *Van Der Waal* (1952) 114 Cal.App.2d 167, 170-172 [249 P.2d 846] [jury not bound to accept the opinions expressed by medical experts even where no opposing opinion is offered].)[7]

In this case, there was substantial evidence in the record contradicting or disproving the foundational facts on which the testimony of appellants' two experts was based. Although Dr. Ray testified at trial (and appellant repeats in his briefs) that Howard's exposure to asbestos was "significant and heavy," with conditions "like walking in a snowstorm," this description was hers, not Howard's. In fact, Howard's trial testimony supports a conclusion he had at most only incidental exposure to asbestos for a brief period during

---

testimony of an expert in such a case is not conclusive in the sense that it must be accepted as true. Indeed, there is often considerable disagreement between different witnesses concerning the standard of care or skill ordinarily used and the trier of fact must resolve the conflict thus raised. It is conclusive, however, to the extent that it may not be contradicted by the testimony of a nonexpert witness." (*Liberty Mut. Ins. Co.* v. *Industrial Acc. Com., supra,* 33 Cal.2d at p. 95.)

[7]The point we make here finds additional confirmation in the 1995 revision of BAJI No. 2.40. As printed in the eighth edition of BAJI, the last sentence formerly read as follows: "However, you may not arbitrarily or unreasonably disregard the [expert medical, scientific, etc.] opinion testimony in this case *which was not contradicted. Therefore, unless you find that it is not believable, it is conclusive and binding on you.*" (BAJI No. 2.40 (8th ed. 1994 bound vol.), italics added.) In the 1995 revision, the italicized words were omitted from BAJI No. 2.40. The "comment" to this revision states that it was "based upon" the case of *Conservatorship of McKeown, supra,* 25 Cal.App.4th at pp. 508-509. (BAJI No. 2.40 (1995 rev.) (8th ed. pocket pt.).) The trial court in this case instructed the jury using the revised version of BAJI No. 2.40, without the "conclusive and binding" language. Howard has never contended that the revised jury instruction is erroneous or misstates the law.

his naval career. Howard testified unequivocally that he was not exposed to asbestos while serving in the Army, while attending college, or while working in the federal civil service. During his approximately 10 years of service in the United States Navy, he worked either as a torpedoman, a communications technician, or as a bosun's mate. In connection with all these jobs, he worked primarily in ventilated or above-deck areas, never venturing into the boiler or engine rooms on board ship. During the entire period he was in the Navy, Howard never removed, applied, installed or worked directly with any material that he thought contained asbestos. Howard's only testimony relative to possible asbestos exposure was his comment about periodic unidentified "dust" on his bunk blanket, and his description of supervising the removal of asbestos insulation for approximately two months in 1969. Based on this testimony, the jury could reasonably have concluded Howard had simply not received sufficient asbestos exposure to cause the injuries alleged.

Side by side with this paucity of evidence of asbestos exposure, there was substantial evidence that Howard's breathing difficulties and lung-related illnesses were caused by factors or agents *other than* asbestos. Howard had a lifetime habit of smoking *at least* two packs of unfiltered cigarettes a day, beginning when he was still a young teenager. There was uncontradicted evidence Howard suffered from chronic obstructive pulmonary disease, a condition unrelated to asbestos exposure that produced difficulty in breathing. In addition, there was undisputed evidence that both of Howard's parents had died of lung disease, and that Howard was genetically predisposed to lung cancer. The jury could reasonably have concluded Howard's lung disease was caused by a combination of these factors rather than by asbestos exposure.

The jury could also have deemed it significant that Howard did not introduce *any* pathological evidence showing he was suffering from asbestos-related disease, despite Dr. Ray's own testimony that pathological evidence was the "ultimate or gold standard" for diagnosing asbestos-related lung disease. Howard's own expert testimony supported a conclusion that clinical diagnostic evidence of the sort he did present was of ancillary value only, requiring as one of two "absolute requirements" for its reliable use in diagnosing asbestosis some additional history of a "significant exposure to asbestos." In considering Dr. Ray's clinical diagnosis, the jury could properly take into account the absence of any confirmatory pathological evidence, and Howard's own testimony describing minimal exposure, if any, to asbestos.

The jury may have found Dr. Ray's testimony lacking in credibility for other reasons. Dr. Ray first told the jury that occupational history showing

"significant exposure to asbestos" was an essential component of the clinical examination and diagnostic process. She then testified she based her asbestosis diagnosis in part on Howard's single interview with her in October 1995, and his description of an occupational history of "significant and heavy" asbestos exposure over a period of 10 years during which he personally worked in a Navy machine shop in conditions "like walking in a snowstorm," ripping out asbestos-containing insulation and pipe-wrapping. On cross-examination, Dr. Ray admitted she had not heard Howard's trial testimony, which clearly contradicted her understanding of Howard's occupational history. As the record shows, Howard did *not* work personally or directly on the removal of asbestos-containing insulation. The jury could conclude either that Dr. Ray had misunderstood the nature of Howard's occupational history, or that Howard had been less than accurate in how he described it to Dr. Ray. In either case, the conflict between Dr. Ray's understanding of Howard's occupational history and his trial testimony describing that history undermines the factual foundation for much of Dr. Ray's expert opinion evidence, and with it the credibility of her testimony.

Alternatively, the jury could have disbelieved Dr. Ray's testimony based on her admitted lack of certification in the commonly accepted system used to read, grade, and make diagnoses of occupational pulmonary disease from chest X-rays. Aside from her (faulty) understanding of Howard's occupational history, the primary basis for Dr. Ray's clinical diagnosis of asbestos was her analysis of Howard's chest X-ray. In evaluating her opinion testimony, the jury could take into account the fact Dr. Ray had failed to take the examinations necessary to maintain her X-ray reading certification. It could also consider her acknowledgment on cross-examination that she had previously written that pleural plaques do not impair lung functioning, which was directly contrary to her earlier trial testimony and the stated basis for her diagnosis of asbestos in Howard's case.[8]

Finally, with regard to Dr. Smith's relatively brief testimony, the record shows his expressed opinion that asbestos exposure was a cause of Howard's lung cancer was explicitly based on Dr. Ray's diagnosis of Howard. To the extent the jury rejected Dr. Ray's testimony, it could also reject that of Dr. Smith. In any event, Dr. Smith's testimony was based on the hypothetical assumption that Howard had "substantial exposure" to asbestos and worked "routinely" around or with it on board ship. The jury could properly reject

[8]The jury also heard evidence that Dr. Ray was retained and paid by Howard's attorneys for purposes of this litigation; she had been employed by that law firm for over 10 years in support of the firm's asbestos litigation practice; and she rarely diagnosed a patient referred to her as *not* suffering from an asbestos-related disease. Of course, the jury could properly take all this information into account in evaluating Dr. Ray's testimony.

his opinions to the extent it found the assumption on which they were based lacked an adequate factual foundation. As discussed, there was ample evidence in the record contradicting the assumption Howard suffered substantial routine exposure to asbestos. The jury was therefore well within its right to reject Dr. Smith's opinion.

In sum, there is substantial evidence in the record to support the jury verdict in favor of Owens Corning. The jury was not required to treat as conclusive the expert witness testimony offered by Howard, even though Owens Corning did not offer any expert witness testimony of its own. Contrary to Howard's apparent assumption, failure to provide opposing expert witness testimony does not necessarily make the expert testimony which is offered "uncontradicted." Here, there was ample evidence in the record which the jury could use in concluding Howard's expert witness testimony either lacked foundation or was not credible. Because the verdict was supported by substantial evidence, the trial court did not err in denying either the motion for directed verdict or the motion for a new trial. (*Gordon v. Strawther Enterprises, Inc.* (1969) 273 Cal.App.2d 504, 511 [78 Cal.Rptr. 417, 39 A.L.R.3d 809].)

## IV. DISPOSITION

The judgment is affirmed.

Corrigan, J., and Parrilli, J., concurred.