Filed 12/12/14 In re M.D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.D. et al., Persons Coming Under the Juvenile Court Law. | |
| | D065420 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518440 A & B) |
| v. | |
| KELLY S. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge. Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant Kelly S.

Christy C. Peterson, under appointment by the Court of Appeal, for Defendant and Appellant Benjamin D.

Thomas E. Montgtomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Carra L. Rhamy, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego and Maria Diaz for Minors.

Kelly S. and Benjamin D. appeal orders of the juvenile court terminating parental rights to, and ordering a permanent plan of adoption for, their children, M.D. and A.D. Kelly[1] challenges the sufficiency of the evidence to support the court's finding that the beneficial parent-child relationship exception to termination of parental rights and adoption found in Welfare and Institutions Code[2] section 366.26, subdivision (c)(1)(B)(i) is inapplicable.[3]  Alternatively, Kelly contends the court erred by selecting a permanent plan of adoption rather than guardianship.  We affirm.

---

[1]     Benjamin joined in all of Kelly's arguments at the hearing in the juvenile court that resulted in the orders on appeal.  In this appeal, Benjamin joins in the arguments raised by Kelly in her briefs on appeal.  (Cal. Rules of Court, rule 8.200(a)(5).)  Thus, a reference in this opinion to an argument by Kelly includes Benjamin as well.

[2]     All further statutory references are to the Welfare and Institutions Code.

[3]     Kelly's notice of appeal indicates she is also appealing from the denial of her section 388 request to change the court's order terminating reunification services. However, having raised no argument in her briefing as to this ruling, Kelly has abandoned any claim of error. (*Title Guarantee & Trust Co. v. Fraternal Finance Co.* (1934) 220 Cal. 362, 363; see *In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

2

FACTUAL AND PROCEDURAL BACKGROUND[4]

At A.D.'s birth in 2006 (when M.D. was a toddler), Kelly and A.D. tested positive for methamphetamine, and Kelly admitted both that she smoked methamphetamine and that she had failed to seek prenatal care during the pregnancy. As a result, the San Diego County Health and Human Services Agency (the Agency) provided Kelly with voluntary services related to substance abuse addiction. However, the Agency closed its case plan after almost 11 months, because Kelly did not complete any component of it other than applying for cash aid and Medi-Cal.

In May 2011, Kelly was arrested at her apartment for possession of methamphetamine. In August 2011, the Agency opened a second voluntary case after substantiating a referral reporting in part that the children were outside late at night unsupervised, they were often yelled at and spanked by Kelly, and she was still using methamphetamine.

In September 2011, Kelly was granted deferred entry of judgment on the pending possession charges and ordered to complete a drug diversion program. (See Pen. Code, § 1000 et seq.) She tested positive for methamphetamine and amphetamine, or refused to drug test, multiple times between January and May 2012. During that same time, the Agency received reports that the family's apartment was in disarray, that Kelly was displaying paranoid behavior and that she and her boyfriend had been physically abusive

---

[4]    In accordance with the applicable standard of review (see pt. B., *post*), we recite the facts in a light most favorable to the orders on review. (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 667, fn 2.)

3

to each other in front of the children. Kelly was also dropped from a weekly parenting education program for lack of attendance.

Based on Kelly's performance, the Agency closed the second voluntary case as a failure. The Agency remained concerned, however, that the children were being exposed to domestic violence and that Kelly's methamphetamine use was adversely affecting her abilities to parent them and ensure their safety.

During this same time, Kelly was not reliably getting the children to their elementary school.[5] In May 2012, she failed to pick up the children from their after-school program; M.D. and A.D. reported that Kelly left them unattended at home for hours, and even days, at a time. They also stated that when they were home alone, they had to prepare their own food, and at times there was no food. Kelly admitted, and others confirmed, that there was domestic violence in the home.

In June 2012, the Agency filed petitions under section 300, subdivision (b), alleging that Kelly and Benjamin failed to protect the children[6] and requesting the issuance of protective custody warrants for the children under section 340. The court found reasonable cause to remove the children and ordered the issuance of the protective

---

[5]     For the school year that began in September 2011, the children's attendance records showed that M.D. had been tardy 59 times and A.D. had been tardy 48 times; both had 14 absences due to illness and three unverified absences.

[6]     The Agency alleged: "The child has suffered, or there is substantial risk that the child will suffer serious physical harm or illness, [¶] by the inability of the parent or legal guardian to provide regular care for the child due to the parent's or legal guardian's' [*sic*] mental illness, developmental disability, or substance abuse."

4

custody warrants. It also ordered the children's detention, subject to supervised visitation, and voluntary services for Kelly.

Shortly thereafter, Kelly acknowledged recent methamphetamine use, saying that although she did not have a drug problem, she would finish the drug diversion program "to 'appease' the court." She made no effort to see the children, despite two inquiries by the social worker.

Benjamin was cooperative and expressed a willingness to participate in reunification services, including parenting classes and sobriety, in order to rebuild the relationship with the children and participate in visitation. Following a successful supervised visit, the social worker recommended supervised visits in the future for Benjamin to demonstrate his parenting skills and sobriety.

The case plans for Kelly and Benjamin included referrals to specific programs that the Agency believed would assist in their reunification efforts. Although Kelly enrolled in a substance abuse program, she failed to attend regularly and tested positive for methamphetamine twice during the first two weeks of July 2012. Additionally, ignoring the Agency's recommendations, Kelly failed to arrange for therapy, and Benjamin failed to attend the drug meetings or parenting classes.

By the time of the combined jurisdictional/dispositional hearing in August 2012, the children were living in the home of a maternal aunt (Caregiver). At the hearing, the juvenile court sustained the petition with a true finding on the section 300, subdivision (b) count. (See fn. 6, *ante*.) The court declared M.D. and A.D. dependent

children pursuant to section 360, subdivision (d) and directed the Agency to find a suitable placement pursuant to section 361.2, subdivision (e).

Meanwhile, Kelly continued to test positive for methamphetamine and was dismissed from two separate drug treatment programs, as well as from counseling and mental health services. Providers reported Kelly was often late and never accepted the depth of her addiction.

Benjamin failed to complete the parenting classes, had no proof of attending drug treatment meetings (although he reported otherwise), and tested positive for marijuana and a combination of methamphetamine, amphetamine and marijuana. After Benjamin missed three consecutive visits with the children, the Agency terminated his visitation services; by the time of the six-month hearing, he had not seen the children for more than four months. In the meantime, both M.D. and A.D. were healthy and adjusting well to living with Caregiver.

Shortly before the six-month hearing, Kelly and Benjamin reengaged in services; Kelly was in detox and Benjamin stated a willingness to participate in drug treatment. However, the Agency reported continuing concern as to the children's safety should they be returned to Kelly, based on both parents' continued drug use and Kelly's lack of insight as to her addiction and its impact on her, the children and her ability to care for the

children.[7]  Further, Benjamin had not demonstrated either a commitment to the children or the ability to provide them with a safe environment.

At the six-month hearing in January 2013, the court found that returning the children to Kelly's custody would create a substantial risk of harm to their physical and emotional well-being.  Further, the court ordered Kelly to meet with a specialist in substance abuse.  Based on the specialist's recommendation, the Agency requested and the court ordered Kelly to drug court in February 2013.

Despite this, Kelly continued to test positive for methamphetamine and amphetamine and miss treatment sessions.  One substance abuse specialist reported that Kelly was in denial and "not really getting it."  In addition, Kelly was only "fairly consistent" in attending her drug court hearings.  Finally, with regard to visitation, Kelly was often late, had difficulty setting limits for and redirecting the children, and once pulled A.D. across the rug in a fit of anger, causing A.D.'s foot to bleed slightly.

Benjamin continued to test positive for drugs, was discharged from his last treatment program in early June 2013 and was arrested on new drug charges the next week.  Despite multiple attempts, the Agency was unable to contact Benjamin, and he made no effort to return messages or otherwise reach the social worker.  Benjamin also had no contact with either of the children during this time.

---

[7]  Kelly felt that because the children did not witness her drug use, they were not affected by it.

M.D. and A.D. continued to live with Caregiver, providing strong support for each other and enjoying good health and success in school. Caregiver wanted to do whatever was necessary to allow the children to stay with her, and Kelly and Benjamin were comfortable with this arrangement. M.D.'s therapist reported that Caregiver " '[wa]s doing a great job' " with the children.

Based principally on the parents' continued drug use, the Agency recommended that services be terminated. At the 12-month review hearing in July 2013, the court ordered Kelly to drug test that day, continued in place all prior orders and set the matter for trial.[8] Kelly checked into a residential drug treatment program on August 20, 2013, but was involuntarily discharged nine days later because she had left the facility without permission.

At the 12-month contested hearing in September 2013, the court found that Kelly and Benjamin had not made substantive progress with their respective case plans and that there was no substantial probability that either parent would be given custody of M.D. or A.D. within the next six months. The court terminated reunification services and set a hearing date under section 366.26 to implement a permanent plan of adoption, guardianship or other permanent living arrangement for the children.

At the contested section 366.26 hearing on February 11, 2014, Kelly testified that she had been residing at a drug treatment facility — and had been sober — since

---

[8]     The court advised Kelly that that the matter would be set for trial "a long way out . . . because I want to see how you are doing in the drug treatment. . . . [W]e have a mother who is not participating in services and not getting clean . . . ."

November 1, 2013, and was attending group therapy meetings and classes (including domestic violence, anger management, NA/AA, and parenting and child development).[9] She also argued that she had maintained frequent contact with the children throughout the case, that during the supervised visits she engaged appropriately and lovingly with the children, and that she shared a positive relationship with M.D. and A.D., who had expressed a desire to return to living with her.

At the time of the hearing, Benjamin was in custody on several theft- and drug-related charges. Although he was present for the hearing, Benjamin did not offer evidence of his own.

The Agency asserted that Kelly had made very limited progress with regard to the provisions of her case plan,[10] lacked insight into both the magnitude of her drug use and its impact on the children, and was merely in the very early stages of recovery. Likewise, although Benjamin was given ample opportunity to reunify, he made very minimal progress with his case plan, instead continuing with his substance abuse addiction and making poor lifestyle choices that often resulted in incarceration. With regard to

---

[9]     These facts relating to her November 2013 entry into the residential treatment program had been the basis of Kelly's previously filed section 388 request to change the September 2013 order terminating reunification services. At the February 11, 2014 hearing, the court took evidence, listened to the argument of counsel and denied Kelly's request — finding that although circumstances were changing, they had not sufficiently changed for purposes of section 388. Kelly raises no issues in this appeal as to the denial of her section 388 request.

[10]     For example, during the pendency of this dependency case, Kelly attempted to engage in drug treatment services on 11 separate occasions.

visitation, the Agency pointed out that although Kelly "maintained frequent contact" with the children, it never progressed past supervised visits and had "not always been regular and consistent." The visitation monitor reported that during the visits, the children regressed and acted like babies, Kelly failed to set limits on the children's behavior (requiring the monitor to redirect the children), and on one occasion Kelly's anger resulted in a minor injury to A.D. In August 2013, the visitation center had terminated visitation services due to Kelly's excessive no-shows. Finally, Benjamin had not visited the children in the preceding 15 months.

The social worker opined that M.D. and A.D. were "highly adoptable" (both individually and together), that Caregiver had expressed a strong desire to adopt them and that Caregiver had already developed a parental relationship with the children such that they called her "mom" or "mommy." Both M.D. and A.D. felt safe, loved and cared for in Caregiver's home; they appeared to understand — and did not express reservations about — their potential adoption by Caregiver.

Adopting the Agency's recommendations, the court (1) found by clear and convincing evidence that M.D. and A.D. would likely be adopted and that none of the exceptions in section 366.26, subdivision (c)(1)(B) applied; (2) terminated parental rights; and (3) identified adoption as M.D.'s and A.D.'s permanent plan.

DISCUSSION[11]

A.      *Applicable Law*

Once reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows a caregiver to make a full emotional commitment to the child.  (*In re Jason J.* (2009) 175 Cal.App.4th 922, 935-936 (*Jason J.*).)  At the section 366.26 selection and implementation hearing, the juvenile court has three options:  (1) terminate parental rights and order adoption as the permanent plan;  (2) appoint a legal guardian for the dependent child; or (3) order the child placed in long-term foster care.  (*In re Jason J.*, *supra*, at pp. 935-936.)  As shown by the language of section 366.26, subdivision (b),[12] the Legislature has directed a "mandatory preference for adoption over legal guardianship over long-term foster care."  (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888; see *In re Michael G.* (2012) 203 Cal.App.4th 580, 588 (*Michael G.*).)

Thus, at a section 366.26 hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is *required* to terminate parental rights and select adoption as the permanent plan,

---

[11]      The children join in all arguments raised by the Agency.  (Cal. Rules of Court, rule 8.200(a)(5).)

[12]      "At the [section 366.26] hearing, . . . the court, in order to provide stable, permanent homes for these children, . . . shall make findings and orders *in the following order of preference*:"  termination of parental rights and adoption; guardianship; and long-term foster care.  (§ 366.26, subd. (b), italics added.)

11

unless the parent shows that termination of parental rights would be "detrimental" to the child under one of the seven exceptions listed in section 366.26, subdivision (c)(1)(A) and (B). (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589; *Jason J.*, *supra*, 175 Cal.App.4th at p. 936.)

The beneficial parent-child relationship exception found in section 366.26, subdivision (c)(1)(B)(i) provides an exception to adoption if termination of parental rights would be detrimental to the child upon a showing "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*) The statutory phrase "benefit from continuing the relationship" means that the parent-child relationship "promotes the well-being of the child *to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.*" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, italics added (*Autumn H.*).) In determining the benefit to the child for this purpose, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a *substantial, positive emotional attachment* such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*, italics added.)

The parent asserting the applicability of this statutory exception must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The beneficial parent-child relationship

12

exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575)  Such a parent must show that he or she "occupies a 'parental role' in the child's life."  (*In re Derek W.*, *supra*, at p. 827.)

"A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent."  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466, italics in original.)  That is because "[i]nteraction between natural parent and child will always confer *some* incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; italics added.)  Thus, such a child "should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to *some* degree, but that does not meet the child's need for a parent."  (*In re Angel B.*, *supra*, at p. 466, italics added.)

B.      *Standard of Review*

In determining whether the section 366.26, subdivision (c)(1)(B)(i) exception applies, which necessarily includes the choice of placement, the juvenile court's finding is reviewed for sufficiency of the evidence.  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; *Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)  This is so even where, as here, the juvenile court made its finding based on clear and convincing evidence.  (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.)

Under the substantial evidence standard of review, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving

13

the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court." (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589.) As particularly apt here, "the test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 (*Howard*).)

C.      *Application of the Beneficial Parent-child Exception*

Tracking the language of section 366.26, subdivision (c)(1)(B)(i), Kelly contends the juvenile court erred, because she established both that she maintained regular visitation and contact with the children and that the children would benefit from continuing the relationship with her.[13]

---

[13]     In her reply, Kelly argues that *Autumn H.*'s interpretation of section 366.26, subdivision (c)(1)(B)(i)'s phrase "benefit from continuing the relationship" merely *suggests* that certain factors be applied, whereas the statute itself requires *only* evidence that "the child would benefit from continuing the relationship." However, we do not consider arguments raised for the first time in reply. (*In re Daniel M.* (2003) 110 Cal.App.4th 703, 707, fn. 4 (*Daniel M.*).) In any event, we will continue to follow the *Autumn H.* balancing test, since it has been applied by this and other appellate courts for more than 20 years and is settled law. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529 [suggestion that "the law has departed from the *Autumn H.* line of cases" rejected].)

1.    *Regular visitation*

Kelly argues that the juvenile court erred in not finding she visited with her children "sufficiently" to have *required* application of the beneficial relationship exception. In so doing, Kelly relies on the frequency of the visitation, noting that she attended the majority of the visits and emphasizing the social worker's comment that over the course of the case Kelly maintained "frequent contact" with the children. Kelly then posits that because "frequent" means "regular," she met her burden of proof in establishing "regular visitation and contact" for purposes of applying the section 366.26, subdivision (c)(1)(B)(i) exception.[14] We disagree.

Although Kelly relies on the frequency of her contact, evidence presented in conjunction with the section 366.26 hearing supported the ruling that her contact with M.D. and A.D. was "*not always . . . regular and consistent*." (Italics added.) The social worker explained the struggles Kelly had with excessive tardiness, cancellations and no-shows — including the termination of visitation services in August 2013 due to no-shows, followed by the two-and-a-half-month time period through mid-November 2013 in which she stopped visiting the children entirely. This evidence alone fully supports the

---

[14]    For the first time in her reply brief, Kelly argues that we should apply de novo review in interpreting the word "regular" in the clause "regular visitation and contact" in subdivision (c)(1)(B)(i) of section 366.26. We reject Kelly's suggestion. Again, arguments raised for the first time in reply are forfeited. (*Daniel M.*, *supra*, 110 Cal.App.4th at p. 707, fn. 4.) In any event, we need not interpret the word in this appeal since, as discussed in the text, *post*, given the social worker's reports, regardless of the meaning of "regular," Kelly did not meet her burden of proving the statutory minimum standard for "regular visitation and contact" in order for the exception to apply.

court's statement at the hearing that "although there has been contact, it has been sporadic. It has not risen to the level of regular and consistent contact with the children . . . ."[15]

### 2. *Benefit to the children*

Kelly focuses on bits and pieces of individual evidence that she contends preponderate in favor of the ultimate finding she wishes the juvenile court had made, namely, that her relationship with the children was so beneficial to them as to outweigh the well-being they would gain in a permanent home with new adoptive parents. Such showing, however, is insufficient to establish reversible error on appeal.

"[P]reponderance of the evidence" is one of the recognized burdens of proof for a party that is required to establish a fact by the trier of fact. (Evid. Code, § 115.) The preponderance of the evidence standard of proof is " 'more likely than not.' " (*People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1305, fn. 28.) In contrast, to obtain relief on appeal, Kelly must establish, under the appropriate standard of *appellate* review, that the trial court committed prejudicial error. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 166 (conc. opn. of Kennard, J.).) Unlike proceedings in the trial court, the purpose of an appeal is not to determine the case on its merits, but instead to review decisions of the trial court for potential error under appropriate appellate standards.

---

[15] The fact that the record may contain substantial evidence in support of a contrary finding — as argued by Kelly — is irrelevant to our role on appeal, which is limited to determination of the sufficiency of the evidence in support of the findings actually made. (*Howard, supra,* 72 Cal.App.4th at p. 631.)

16

(Eisenberg et al., Cal. Practice Guide:  Civil Appeals and Writs (The Rutter Group 2013) ¶ 1:12, p. 1-2 (rev. #1 2009); see *In re Zeth S.* (2003) 31 Cal.4th 396, 404.)

Given the nature of appellate review for substantial evidence, Kelly must show more than the evidence that arguably demonstrates the existence of a beneficial relationship between her and the children.  Instead, we must focus on whether substantial evidence and its inferences exist to support the *actual* finding of the juvenile court that Kelly's relationship with the children was not so beneficial as to outweigh the benefits of adoption.  There is such evidence here.[16]

From a very early age through the removal of the children from Kelly's custody, the children were exposed to substance abuse, domestic violence, criminal conduct and neglect.  Significantly, Kelly had a substance abuse history dating back many years, and she lacked insight into both the magnitude of her drug use and the impact her addiction had on the children.

Since the beginning of the case, Kelly made very limited progress with her case plan.  She would often begin treatment — at times by court order — but was unable to commit to participating in her recovery.  She had a pattern of stopping treatment prematurely and reengaging in her addiction.  Further, as noted above, Kelly's contact with the children never progressed past supervised visits and was "not always . . . regular and consistent."  Kelly struggled with excessive tardiness in addition to no-shows and

---

[16]     Kelly does not rely on facts relating to the termination of Benjamin's parental rights, and Benjamin asserts no arguments independent of Kelly's.  Thus, we will discuss only the evidence in support of the court's ruling that the substantial benefit exception does not apply to the termination of Kelly's parental rights.

cancellations. In August 2013, the visitation center cancelled services for Kelly because of her excessive no-shows; for the next two and one-half months, due to Kelly's continuing struggle with drug addiction, she did not visit the children and only rarely called them. Notably, throughout the two and one-half months that Kelly distanced herself from the children, they did not appear distressed, were functioning well, and seldom inquired about her. Even during otherwise successful visits, the children regressed and acted like babies, Kelly did not set limits on the children's behavior, the monitor had to redirect the children, and at one visit Kelly injured A.D. in anger.

By contrast, the children were doing well with Caregiver, who had expressed a strong desire to adopt both of them, thereby providing them with a stable and permanent home and family. Caregiver had developed a motherly relationship with each of the children. Caregiver, not Kelly, had been the adult responsible for successfully ensuring the children's physical, emotional and educational needs were met, and she was committed to providing these needs on a permanent basis. Both M.D. and A.D. felt safe, loved and cared for in Caregiver's home and expressed no reservations about their potential adoption by Caregiver.

Despite these facts, Kelly relies on different evidence which, had the juvenile court credited it, may have supported a different outcome. In so doing, Kelly essentially asks us to reweigh the evidence in support of the beneficial relationship exception. However, we may not do so. (*In re Laura F.* (1983) 33 Cal.3d 826, 833.)

Finally, Kelly contends the juvenile court erred in considering the social worker's comment that, upon adopting the children, Caregiver was willing to facilitate a

18

continuing relationship between Kelly and them as long as it appeared to be in their best interests. (See *In re S.B.* (2008) 164 Cal.App.4th 289, 300 ["We do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents."].) First, not having objected to this evidence in the trial court, Kelly has forfeited such a claim on appeal. (*In re Joy M.* (2002) 99 Cal.App.4th 11, 17; see Evid. Code, § 353, subd. (b).) In any event, even assuming the court erroneously considered such evidence, the error was harmless. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).) Kelly focuses on one sentence of 45 typed pages presented in four reports and fails to explain how the allegedly erroneous admission of this evidence would have made any difference in the outcome. Accordingly, Kelly has not suggested, let alone established, the requisite prejudice for the relief she seeks on appeal.

D.     *Adoption as the Permanent Plan*

In part C., *ante*, we concluded that substantial evidence supports the juvenile court's finding that, by clear and convincing evidence, the beneficial relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i) was inapplicable. Accordingly, based on the statutorily mandated preference (§ 366.26, subd. (b); *San Diego County Dept. of Social Services v. Superior Court*, *supra*, 13 Cal.4th at p. 888), the juvenile court did not err in ordering a permanent plan of adoption rather than guardianship.

19

DISPOSITION

The orders terminating Kelly's and Benjamin's parental rights and ordering a permanent plan of adoption for M.D. and A.D. are affirmed.

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

NARES, J.