Filed 3/12/24  In re A.P. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.P. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. L.P., Defendant and Appellant. | G062917 (Super. Ct. No. 21DP0124, 21DP0125) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Julie Swain, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \*

L.P. (Mother) appeals from the juvenile court's order terminating her parental rights to her two daughters, A.P. and E.P. (sometimes jointly referred to as the minors), at a hearing conducted pursuant to Welfare and Institutions Code section 366.26 (section .26 hearing).[1] Mother contends the juvenile court erred in denying her request to apply the parental-benefit exception to adoption codified in section 366.26, subdivision (c)(1)(B)(i), and explained by the California Supreme Court in *In re Caden C*. (2021) 11 Cal.5th 614 (*Caden C*.). We hold the juvenile court did not abuse its discretion and affirm.

## FACTS AND PROCEDURAL HISTORY

### I.

### THE MINORS' DETENTION

In late January 2021, Mother attempted to choke herself with a towel in the presence of her then eight-year-old daughter, A.P., at the home they shared with the presumed father and E.P., then 18 months old.[2] E.P. was present in the home when the incident occurred but was sleeping. The presumed father called the police, who placed Mother on an involuntary mental health hospital stay. Law enforcement referred the case to the Orange County Social Services Agency (the Agency), which assigned a social worker to investigate. The presumed father reported Mother had tried to hurt herself before, had hit him previously, and was angry, acting erratic, and screaming just prior to the incident. Both the presumed father and A.P. reported that before attempting to

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] The presumed father, who had been married to Mother for over 10 years as of the date of the incident, is not a party to this appeal. We therefore limit our factual summary and analysis to what is relevant to the relationship between Mother and the minors.

2

strangle herself, Mother made a comment to A.P. threatening to kill herself. The presumed father told police Mother gets this way when she has been drinking. Mother later told the social worker she had blacked out from alcohol consumption and did not recall attempting to choke herself. Mother also shared with the social worker that she had a history of depression and blacking out from alcohol, had been diagnosed with posttraumatic stress disorder with dissociative episodes, and had been arrested approximately six months prior to the incident for alleged domestic violence involving the presumed father and E.P.

A.P. reported to law enforcement and the social worker that Mother had been drinking prior to the incident and was yelling and fighting with the presumed father before she attempted to choke herself. A.P. said she would only feel safe with Mother if she did not try to hurt herself again. A.P. also told the social worker her parents hit each other "'a lot,'" with the most recent incident occurring approximately six months earlier. The minors did not have any physical signs of abuse or neglect. Mother was employed at the time.

As a result of the incident and the presumed father's refusal to sign a voluntary safety plan, the minors were removed from parental custody pursuant to a protective custody warrant and placed with their paternal grandparents. According to the paternal grandmother, the minors had spent more of their lives under the care of paternal grandmother and grandfather than they had spent with Mother and the presumed father. The amended child welfare petition filed under section 300, subdivision (b)(1), alleged Mother has unresolved mental health issues, a history of excessive alcohol use, and a history of domestic violence involving the presumed father, including multiple disputes occurring in the presence of the minors. The juvenile court subsequently ordered the minors detained, ordered reunification services, and permitted Mother eight hours of weekly supervised visitation.

3

In August 2021, after multiple continuances, the juvenile court accepted Mother's plea of no contest to the allegations of the amended child welfare petition, found the allegations were true, and declared the minors dependents of the court. The court ordered Mother's supervised visitation to continue. A few days later, A.P. and E.P. were removed from the care of their paternal grandparents and placed with their paternal aunt and uncle in another county, where the minors remained throughout the child welfare proceedings.

## II.

### THE REUNIFICATION PERIOD

As of late August 2021, Mother was attending supervised visitation with the minors on a consistent basis. According to reports from the social worker, A.P. expressed wanting to leave early from certain visits and no longer wanted to visit or see Mother. By the end of 2021, Mother was not consistently utilizing her eight-hour weekly allotment of supervised visits, and she had missed and canceled visits. The visits Mother did have with the minors, however, were positive. By early 2022, Mother was reportedly homeless and unemployed and had missed or canceled multiple visits with the minors. As was the case throughout the child welfare proceedings, when Mother did attend visits, they were positive, and Mother and the minors showed affection to each other.

The social worker prepared a report in early 2022, before the six-month reunification review hearing. The social worker noted A.P. and E.P. were both doing well with their caregivers, with A.P. expressing she wanted to live with her paternal aunt and uncle forever. A.P. missed Mother and the presumed father but was safe and happy with her caregivers. Mother continued to be attentive and responsive during visits, though A.P. still wanted to end some visits early. On one occasion, A.P. did not want to visit with Mother. As a result of Mother's failure to show progress on her case plan

services as approved by the court, the social worker recommended terminating family reunification services and setting a section .26 hearing.[3]

In April 2022, Mother continued to miss scheduled visits with the minors. The visits that did take place continued to be positive, and the minors were observed to interact affectionately with Mother and engage in appropriate play. Mother met with the minors several times in May 2022 and was reported to be "attentive and engaging."

On June 13, 2022, after determining Mother had made only minimal progress toward alleviating and mitigating the issues that led to dependency and that her mental health issues were concerning, the juvenile court ordered reunification services terminated and scheduled a section .26 hearing.

III.

POST REUNIFICATION PERIOD

In the one-year period between the juvenile court's June 2022 termination of reunification services and the section .26 hearing, which took place over multiple days in June and July 2023, Mother's visitation with A.P. and E.P. varied from inconsistent at times to periods of consistent visitation. The visits that did occur continued to be positive. Mother and the minors engaged in play and crafts and were affectionate with each other.

On October 11, 2022, the social worker prepared a section 366.26 report and assessment relating to the minors. The report stated the minors were still living in the home of their paternal aunt and uncle, who were fully committed to adopting them.

---

[3] Mother's case plan services included counseling, psychiatric evaluation, a domestic violence program, a 12-step program, parenting education, substance abuse outpatient treatment, and substance abuse testing. The social worker noted that, since completing a parenting education course almost a year earlier, Mother had failed to provide verification that she had completed a domestic violence program and failed to attend scheduled therapy sessions. In addition, Mother's therapist expressed concern over Mother's ability to provide care to the minors.

Both minors appeared to be comfortable with their caregivers and sought them out for care, comfort, and attention.

The social worker's report also stated the following: A.P. was now in fourth grade and had received a "'most improved'" award for her studies. A.P. was engaged in therapy services and appeared to be happy, with no emotional or behavioral difficulties. The social worker discussed the idea of adoption with A.P., who shared that she "'like[d]'" her caregivers and felt safe with them. In September 2022, however, A.P. reported that while she loved her caregivers, she wanted to live with her dad again. The social worker inquired further regarding A.P.'s stated desire to live with the presumed father versus Mother, and A.P. responded, "'my dad because even if I pick one of them they are both gonna come so I would like to pick my dad.'" When asked about her feelings regarding adoption, A.P. said, "'I would feel sad because I want to go back to [Mother and the presumed father].'" A.P. told the social worker she felt sad because she had not seen her father in "'a long time.'"

In a November 2022 addendum report, the social worker noted A.P. frequently asks about Mother and the presumed father and said she wanted to live with "'both of them'" again. By this time, Mother was permitted two hours of weekly supervised visitation. A.P. told the social worker she does not like when Mother does not attend visitation, but that A.P. still wants to visit with her.

The addendum report also stated that E.P., who by this time was a three-year-old toddler, was in good health, developmentally normal, and doing well emotionally and socially. Due to E.P.'s age, the social worker did not ask her about her preference relating to adoption.

In a January 2023 addendum report, the social worker stated A.P. missed her father and described her visits with Mother as good. A.P. nevertheless said she wanted to be adopted by her caregivers. She inquired about when the adoption would happen, but stated she still wanted to talk with Mother after adoption. But, as of March

6

2023, A.P. was telling the social worker she liked visiting with Mother "'a lot'" and wanted to live with Mother in the future. The minors continued to thrive with the caregivers, and A.P. expressed that if she could not live with Mother, she wanted to live with the caregivers. During one visit with Mother, the social worker observed A.P. hiding in the restroom, leading her to conclude A.P. wanted alone time with Mother rather than having to share visitation with her little sister, who demanded more attention considering her age. The Agency planned to allow for individual visitation time between A.P. and Mother, but there is no indication in the record this ever occurred.

On May 31, 2023, Mother filed a section 388 modification petition seeking to vacate the section .26 hearing and reinstate family reunification services (the 388 Petition). The 388 Petition was based on Mother's successful psychiatric treatment, her enrollment in a residential treatment program, her receipt of continued anger management services, and her successful visits with the minors.

By May 2023, A.P. was again asking the social worker about when she would be adopted and expressing her desire to be adopted by her caregivers. In mid-June 2023, A.P. said she was willing to visit Mother in person but had reservations because of prior missed visits. A.P.'s paternal aunt and caregiver reported to the social worker that A.P. had declined to talk to Mother twice in June when Mother called. Throughout the dependency proceedings, A.P. often asked the social worker about the presumed father, whose whereabouts had become unknown, and expressed sadness and a desire to see him. A.P. asked about the court hearing and said she was nervous the hearing would be rescheduled again.

On at least two occasions in June and July 2023, Mother tested positive for narcotics.

7

## IV.

### THE BONDING STUDY

In connection with the section .26 hearing, Mother asked the Court to order a bonding study be conducted to assess the relationship between Mother and the minors. Rather than asking the court to appoint an independent expert to prepare the bonding study, however, Mother asked the court for permission to retain her own expert to perform the study and submitted the proposed expert's extensive curriculum vitae (CV) to the court for approval. Mother's request to the court stated: "Mother is requesting that [the expert] be able to observe two visits with [M]other and [A.P. and E.P.]. [The expert] would be an observer only. It is not being requested that she be allowed to speak to the children . . . . [The expert] will not speak to any parties during her observations and in the presence of the children. [¶] Mother is not requesting that the Court authorize any funding for [the expert]." The juvenile court approved Mother's request.

In December 2022, Mother's bonding study expert observed two visits between Mother and the minors. Based on those two visits and a review of the section .26 report prepared by the social worker, Mother's expert prepared a written bonding study. The expert concluded both A.P. and E.P. have a strong attachment bond with Mother. As to A.P., the expert stated she "shows a strong connection to her mother . . . as evidenced by the fact that she exhibits proximity-seeking behavior toward her mother that is persistent across the encounters I observed, explicitly values the relationship, and shares information and ideas with her mother throughout her visits with her." The assessment of E.P.'s connection with Mother was almost identical. The expert's recommendation stated, "[o]ngoing contact between [Mother] with [A.P. and E.P.] is needed," and "[c]onsistency at . . . visits is tremendously important for the continued development of this bond." The expert's report further recommended Mother "remove any obstacles to consistent visitation so the children can maintain their bond with their mother."

8

## V.

### THE SECTION .26 HEARING

The juvenile court conducted the section .26 hearing over multiple days in late June and July of 2023 and concurrently considered Mother's 388 Petition to reinstate reunification services. By that time, A.P. was 10 years old, E.P. had turned four years old, and both had been living with their paternal aunt and uncle caregivers for approximately two years.

The juvenile court heard testimony from A.P., the social worker assigned to the minors' case, Mother, and Mother's bonding expert. The court also received into evidence Mother's exhibits filed in connection with the 388 Petition, the social worker's written report and addenda, the CV of Mother's bonding expert, and the expert's written bonding study.

On July 26, 2023, the juvenile court denied the 388 Petition, finding Mother did not meet her burden to show changed circumstances warranting reinstatement of reunification services. The court issued its ruling on the section .26 hearing two days later, finding by clear and convincing evidence the minors were adoptable and terminating Mother's and the presumed father's parental rights. After considering the evidence before it, the court found it was in the best interest of A.P. and E.P. to terminate Mother's parental rights and free the minors for adoption by their paternal aunt and uncle. The court balanced the benefits to both A.P. and E.P. of adoption by their paternal aunt and uncle caregivers against the detriment to the minors of losing their relationship with Mother and found the benefits outweighed any potential detriment. Accordingly, the court concluded the parental-benefit exception of section 366.26, subdivision (c)(1)(B)(i) did not apply.

Mother timely appealed.

9

DISCUSSION

Mother contends the juvenile court abused its discretion in declining to apply the parental-benefit exception of section 366.26, subdivision (c)(1)(B)(i). We disagree. Although the record reflects Mother's commendable efforts to try to maintain a relationship and bond with the minors, often under difficult circumstances, the court's ultimate decision not to apply the parental-benefit exception was not an abuse of its discretion.

I.

THE PARENTAL-BENEFIT EXCEPTION

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (*Id.*, subd. (b).) If a juvenile court has decided to end reunification services, adoption is the legislative preference. (*Id.*, subd. (b)(1); see also *In re Celine R*. (2003) 31 Cal.4th 45, 53 [adoption gives children "'the best chance at [a full] emotional commitment from a responsible caretaker'"].) Accordingly, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can establish one of the exceptions set forth in section 366.26, subdivision (c). (*In re Celine R.,* at p. 53.) "At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid*.)

The exception Mother contends applies here is the parental-benefit exception, which permits the juvenile court to select a permanent plan other than adoption if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C*., *supra*, 11 Cal.5th at page 631, the California Supreme Court

10

"discern[ed] three elements the parent must prove" to establish the parental-benefit exception. For the exception to apply, all three elements must be established by a preponderance of the evidence. (*Id*. at pp. 636–637.)

First, the parent must show "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C*., *supra*, 11 Cal.5th at p. 636.) This element is "straightforward," involving an assessment of whether the parent visits consistently. (*Id*. at p. 632.)

Second, the parent must show "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In assessing whether the child would benefit from continuing the relationship with the parent, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id*. at p. 632.) Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)

Third, the parent must show terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C*., *supra*, 11 Cal.5th at p. 636.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.) This evaluation consists of a "subtle, case-specific inquiry," including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "'would experience from the loss of [a] significant, positive, emotional relationship'"

11

with the parent. (*Ibid*.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child" and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

## II.

### THE STANDARD OF REVIEW

In *Caden C.*, *supra*, 11 Cal.5th 614, the Supreme Court clarified the standard of review applicable to a juvenile court's findings regarding the parental-benefit exception. The first two elements—regular visitation and a beneficial relationship—involve determinations that are essentially factual and are reviewed for substantial evidence. (*Id*. at p. 640.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citations.] Uncontradicted testimony rejected by the trial court '"cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved."'" (*Id*. at p. 640.)

The third element requires the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption. (*Caden C., supra,* 11 Cal.5th at p. 640.) This requires a "hybrid" standard of review. (*Id*. at p. 640.) As with the first two elements, the court must make a series of factual determinations, including determinations about the child's relationship with a parent, which we review for substantial evidence. (*Id*. at p. 640.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.) Under the abuse of discretion

12

standard, our role is to decide whether the court's decision exceeded the bounds of reason; in so doing, we cannot substitute our view for that of the juvenile court. (*Id.* at p. 641; *In re Stephanie M*. (1994) 7 Cal.4th 295, 318–319.) Rather, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.)

III.

ANALYSIS

As an initial matter, the parties dispute whether the juvenile court found in favor of Mother on the first two elements of the parental-benefit exception. The court issued its decision on the record. After reviewing the record relating to Mother's visitation, the court stated it was giving Mother the "benefit of the doubt" on the first element. The court did not, however, issue a clear and unequivocal ruling on the second element. We therefore focus our analysis on the third element of the parental-benefit exception and the court's explicit determination that the benefits to A.P. and E.P. of placing them in an adoptive home with their paternal aunt and uncle outweighs any potential harm they would experience from the loss of their relationship with Mother. Because we affirm the court's decision on the third element and Mother bore the burden of proving all three elements, we need not reach the other two elements. We assume, without deciding, that substantial evidence supported a finding in Mother's favor on the first two elements.

The juvenile court was well within its discretion to deny Mother's request to apply the parental-benefit exception. There was substantial evidence presented at the section .26 hearing of the benefits to the A.P. and E.P. of a permanent, adoptive home with their paternal aunt and uncle. For instance, the minors had already thrived for two years—half of E.P.'s life—in their care, and the minors had a good relationship and intimate bond with the caretakers. Moreover, A.P. testified at the section .26 hearing that

13

she wanted to be adopted even if it meant Mother would not be part of her life anymore.[4] The social worker in charge of the minors' case also testified that, over time, A.P. had expressed a preference to remain with the caregivers over Mother. In addition, there was evidence Mother had failed to alleviate the issues that led to dependency, which the court found was likely to impact Mother's ability to maintain consistent visitation with the minors in the future. The court found Mother "has not shown a future chance of continued benefit to the children" and her continued struggles would "continue to be detrimental [to visits] in the future."

As Mother's bonding expert acknowledged in her testimony—and as the Supreme Court in *Caden C.* underscored—the juvenile court's task of sorting through the evidence and balancing the benefits of adoption against the detriment to the minors caused by separating from their parent is often a daunting one. "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden C., supra,* 11 Cal.5th at p. 634.) It is conceivable a court could find (as the juvenile court did here) that "terminating a relationship with negative aspects would have some positive effects that weigh in the balance—and may tip it in favor of severing the parental relationship to make way for adoption." (*Id.* at p. 635.) Here, the court recognized the existence of a bond between Mother and the minors and examined all the evidence before it to weigh the detriment to the minors of losing that relationship against the benefits of adoption. The court concluded the scale tipped in favor of the benefits to the minors of adoption into a loving,

---

[4] As of the section .26 hearing, E.P., who was still too young to provide testimony or articulate her preferences on the issue of adoption, had been living with her paternal aunt caregiver most of her life and was observed to have a significant attachment to both Mother and the caregiver. The evidence also showed A.P. and E.P. appeared to be remarkably close.

stable home. We see no reason to disturb the court's exercise of its discretion in reaching that conclusion.

Mother contends the juvenile court abused its discretion in several respects. First, Mother contends the court rejected and failed to consider the bonding expert's opinion that the minors had an attachment to Mother and would suffer detriment from a termination of their relationship with her. We disagree. The court did consider the bonding expert's opinion in making its decision. However, the bonding study was limited. The expert observed only two visits between the minors and Mother over a total of four hours approximately six months before the section .26 hearing. The bonding expert was never able to speak with A.P. to try to ascertain her wishes, even though the expert acknowledged the potential value of interviewing a child over the age of eight. The expert was hired by Mother, and this was the first bonding study the expert had completed. The expert observed the minors with their paternal aunt caregiver for no more than five minutes at the time of each of the two visits with Mother. And notably, although the expert did conclude the minors would suffer detriment from separating from Mother, she did not offer any opinion on the ultimate issue of whether the benefits of adoption outweighed that potential detriment. Indeed, given the limitations of her study, the expert was in no position to formulate an opinion on that ultimate issue. Moreover, when the expert learned A.P. had testified at the hearing she wanted to be adopted, the expert acknowledged she had formulated her opinion regarding the bond between Mother and the minors six months earlier and "a lot can happen since then." Although the expert testified she did not believe A.P.'s testimony about wanting to be adopted would change her opinion, she acknowledged that the job of deciding this case is a "really hard" one and she was glad she did not have to make it.

Mother points out there was no competing expert opinion on the issue of detriment to the minors arising from separation from Mother. That does not alter our analysis here. As Mother concedes, the juvenile court was not obliged to accept the

15

opinion offered by Mother's expert. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633 [expert opinion "'is only as good as the facts and reasons on which it is based. . . .'"]; *Davenport v. National Reserve Ins. Co*. (1928) 91 Cal.App. 460, 464 [the admission or rejection of expert testimony lies largely within the discretion of the trial court, and its action will not be disturbed on appeal unless there is a showing of abuse of this discretion].) Particularly given the limitations on the expert's study, the potential for bias in a study presented by an expert retained by Mother, and the fact that this was the expert's first bonding study, the court could reasonably accord little or no weight to the expert's opinion on the issue of detriment. In any event, even if the court were obliged to (or did) accept the expert's opinion that the minors were attached to Mother and would suffer detriment from severing that bond, it would not have ended the inquiry mandated by section 366.26, subdivision (c)(1)(B)(i). The court was required to, and did, weigh the potential detriment against other evidence before it of the considerable benefits the minors would experience from being adopted by their long-time caregivers.

Second, Mother contends the court erred by not discounting A.P.'s testimony that she wanted to be adopted because A.P.'s desire had sometimes wavered and, in Mother's view, A.P.'s testimony must have been the result of emotional pressure brought to bear on A.P. We find no error. It was not improper for the court to consider A.P.'s wishes when determining whether termination of parental rights would be detrimental to the child. (*In re I.E.* (2023) 91 Cal.App.5th 683, 694.) Moreover, by arguing the court should have discounted A.P.'s testimony and given more credence to the bonding study, Mother is asking this court to reweigh the evidence. We are not free to do so. (See *Caden C., supra*, 11 Cal.5th at p. 640 [juvenile court's factual determinations upheld if "'supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence'"].)

16

Finally, Mother contends the juvenile court improperly considered Mother's own conduct in reaching its decision, including her failure to complete a drug recovery program, treat her mental illness, take advantage of all the visitation offered her, move beyond supervised visitation, and alleviate the issues that led to the minors' detention. This very argument was squarely rejected by the Supreme Court in *Caden C., supra,* 11 Cal.5th 614. "A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Id.* at p. 637.) "[T]he parent's struggles speak to the benefit (or lack thereof) of continuing the relationship and are relevant to that extent." (*Id.* at p. 638.)

Here, it was not improper for the juvenile court to consider Mother's continued struggles in evaluating "the benefit (or lack thereof) of continuing the relationship" between Mother and the minors and the detriment the minors would suffer if the relationship were severed. (*Caden C., supra*, 11 Cal.5th at pp. 638–639.) "A parent's struggles may be most directly relevant . . . to the '"positive" or "negative" effect of interaction between parent and child' [citation] and then somewhat more indirectly to the harm of removing such interactions from the child's life." (*Id.* at p. 639.) The juvenile court only considered Mother's inability to resolve her issues with substance abuse and mental health to the extent it impacted—and may continue to impact—her ability to maintain consistent visitation with the minors. We find no error in that.

Based on this record, we cannot say the juvenile court abused its discretion by concluding the parental-benefit exception did not apply and selecting adoption as the permanent plan for A.P. and E.P.

## DISPOSITION

The juvenile court's order terminating Mother's parental rights is affirmed.


GOODING, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.