Filed 1/28/25  P. v. Farias CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JORGE ALBERTO FARIAS,<br><br>    Defendant and Appellant. | F088064<br><br>(Super. Ct. No. BF124836A)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  David E. Wolf, Judge.

Barhoma Law, P.C. and Matthew Barhoma for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Michael A. Canzoneri and Barton Bowers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Jorge Alberto Farias appeals from the denial of his Penal Code[1] section 1172.6 (formerly § 1170.95) petition for resentencing.  He contends sufficient evidence did not support a finding that appellant was guilty under a valid murder theory.

---

[1]     All further undesignated statutory references are to the Penal Code.

Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Charges*

An information filed March 25, 2009, charged appellant with one count of first degree murder (§ 187, subd. (a); count 1); two counts of attempted first degree murder (§§ 664/187, subd. (a); counts 2 & 3); and three counts of discharging a firearm from a motor vehicle (§ 12034, subd. (c); counts 4, 5, 6). The information further alleged he personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) as to counts 1, 2, 4, 5; personally discharged a firearm during the commission of an attempted murder (§ 12022.53, subd. (d)) as to count 3; and personally used a firearm (§ 12022.5, subd. (a)) as to count 6.

Appellant underwent two trials. The first did not result in a verdict because the jury was unable to reach one, and the second resulted in a mistrial due to misconduct. The trial transcript, however, went on to form the factual basis of appellant's eventual plea to one count of voluntary manslaughter and one count of attempted murder and was subsequently considered by the trial court in determining whether to grant the present section 1176.2 petition. The facts elicited from that trial transcript are as follows.

### *Facts*

#### *Prosecution Case*

On the night of September 9, 2008, at around 11:30 p.m., Daniel Villanueva, his cousin Veronica Ruiz, and her acquaintance Louie Matthew Alvarez were walking down the street. A white vehicle, described as a "probation-style" vehicle or "probation car" with a spotlight and tinted windows drove up next to them, and an occupant of the vehicle fired several shots out of the driver's side window, killing Alvarez and injuring Villanueva. Nine .22 caliber casings were recovered from the scene.

Villanueva could not see the shooter nor how many people were inside the car. When shown a photograph of appellant's vehicle at trial, Villanueva said it looked the

2.

same as the vehicle, but he "thought it had rims on it." Villanueva did not say anything about rims when previously interviewed by law enforcement.

A defense witness who lived near the scene of the shooting described the vehicle as a probation car with chrome rims. She testified it looked like there were four people in the car, and at least two people in front. She further testified she heard fighting between the shooter and the victims prior to the shooting and that "you could tell they didn't like each other."

Ruiz described the shooter as a male with dark skin and a "Mexican" accent, who was wearing sunglasses and a blue polo shirt. She told officers she saw three silhouettes in the vehicle.

Near the scene, law enforcement located a parked vehicle that matched the suspect vehicle's description. Ruiz was transported to the vehicle and positively identified it. The vehicle was parked outside an apartment where appellant's friend Maria Coria resided with her sister and their children. Law enforcement made a "surrender call-out," and at the fourth call out, Coria came out. When asked if there were any males in the apartment, she said no but that her children were inside. She was instructed to go inside and get her children and come back outside. After several minutes, appellant came out wearing jeans and no shirt. He was taken into custody. It later was determined that appellant was the registered owner of the vehicle, which was a former probation vehicle, and his fingerprints were located inside the vehicle.

Coria testified that she had known appellant since high school. He had been at her apartment the night before the shooting for a get-together, and the two spoke on and off throughout the day of the shooting; at one point they met at a park to discuss damage done to her apartment by appellant the night before. Later, on the night of the shooting, appellant went to Coria's apartment with another man to apologize to her sister for the damage caused. Appellant left, and 15 minutes later, he called her and told her to come outside; he had come back alone. He was acting nervous. He told her he "fucked up"

3.

and was "gone."  He had a firearm that he pulled from his waistband and tried to give it to her, but she would not take it.  Police showed up at the apartment shortly after, and appellant went to the restroom and took off his clothes, including the blue striped shirt he was wearing.

A search warrant was served at Coria's apartment, and a .22 caliber semiautomatic firearm was located in the drawer underneath the oven.  The magazine inside the firearm was empty.  Forensics determined the shells obtained from the scene were fired from the gun with "absolute[] certain[ty]."  A "Foot Locker" polo shirt was also recovered from Coria's apartment.

A search warrant was also served at appellant's home, which was near the scene and Coria's apartment.  A few .22 caliber bullets were located on the floor near a bed and 32 more were found in the nightstand in the same area; the brand of the bullets matched that of the casings found at the scene.  A DMV letter addressed to appellant with the address of the residence was found near the bullets.  Sunglasses were also recovered from appellant's apartment.  Appellant's mother, who also lived in the home, identified the items recovered from the home as appellant's.

After appellant's arrest, he made the following statement to law enforcement:

> "I'm only going to say one thing.  [¶] … I'm not a gangster ….  My mom has always worked in the field, in the field there….  If what I did because of some very personal things because I don't like others messing with my family.  And my mom has always worked in the field….  If I have tattoos … it is because maybe I have behaved badly.  But what I did was so I could defend my family members.  That's the only thing I can say.  But I don't belong to any gang.  Nor—I'm not a gangster.  I'm none of that.  I'm a normal person.  No.  When you see someone like me, you think someone like me is a gangster.  I don't have any neighborhood tattoos.  The only thing I have tattooed is here on my chest where I'm asking my mother for forgiveness.  That's all I can say."

### *Defense Case*

Appellant's defense was that his friend, Omar Cisneros, was the perpetrator, and that he was not present at the time of the crime. He presented evidence through his girlfriend, his girlfriend's family members, his sister, and his own testimony that he and Omar Cisneros lived together at appellant's girlfriend's house in Modesto in the months leading up to the incident. Shortly before the incident, appellant's girlfriend's mother asked Cisneros to leave because he was not contributing to the household. Cisneros sold his vehicle, and he and appellant went down to Bakersfield together to live with appellant's mother in July or August. They slept on bunk beds in the living room. Appellant's sister testified Cisneros just disappeared and left some clothes and a pair of sunglasses. Cisneros regularly carried a firearm that the defense witnesses stated looked similar to the firearm used in the shooting and wore sunglasses, as well as prescription glasses.

Appellant testified that when he and Cisneros began living in Bakersfield, Cisneros would borrow appellant's car. On the night of the incident, Cisneros was with two of his friends and asked appellant to borrow his car because Cisneros and his friends wanted to buy beer. Appellant asked Cisneros to take him to Coria's place and drop him off first. Cisneros agreed and the four men went to Coria's apartment to drop off appellant. Later that evening, while at Coria's apartment, appellant called Cisneros to see if he was going to come pick him up, and as they were talking, he saw Cisneros pull up, so he went downstairs. Cisneros gave appellant the keys to the car, said he had to leave, and started walking down the street. Appellant then walked back up to Coria's apartment and called her to see if she wanted him to stay, and she said he could. Appellant went back down to the car because he noticed the windows were down and saw a gun in the car. He recognized it as the gun Cisneros always had on him. Appellant then called Cisneros and asked him what was his gun doing there? He asked Cisneros "did you chase him. Did you fire at him"? Appellant was frightened, so he grabbed the gun and

went upstairs and told Coria "this dude just fucked that up." He asked her if he could hide the gun there. Coria did not respond, so he hid it under the stove. Then he went to bed in Coria's room and was there until the police showed up to arrest him.

Another defense witness who lived near Coria's apartment testified that he overheard appellant on the phone the night of the shooting asking, "Did they shoot him"?

### Appellant's Plea and Initial Sentencing

On February 22, 2012, appellant pled no contest to one count of voluntary manslaughter (§ 192, subd. (a); count 7) and one count of attempted murder (§§ 664/187; count 2) and admitted he personally used a firearm (§ 12022.5, subd. (a)) during the commission of count 7 in exchange for dismissal of the remaining counts and allegations and an agreed upon sentence of 11 years for the voluntary manslaughter count, nine years for the attempted murder count, and 10 years for the firearm enhancement for a total term of 30 years. The parties stipulated that the factual basis for the plea was the offense reports, lab reports, prior trial transcripts, and photographs.

At appellant's initial sentencing on March 22, 2012, he was sentenced in accordance with the plea agreement.

### Section 1172.6 Petition and Subsequent Appeal

In December 2019, appellant filed a petition for resentencing pursuant to section 1172.6. On December 24, 2019, the trial court summarily denied appellant's petition because he was not convicted of murder and therefore not eligible for resentencing. Appellant appealed from the order denying his petition.

In October 2021, while appellant's appeal was pending, the Legislature enacted Senate Bill No. 775 (2021-2022 Reg. Sess.), which became effective on January 1, 2022, and clarified that persons convicted of manslaughter and attempted murder are not categorically barred from resentencing under section 1172.6. (Stats. 2021, ch. 551, § 2.)

6.

Accordingly, the People conceded reversal was appropriate, and this court reversed the order denying appellant's petition for resentencing and remanded for further proceedings under section 1172.6. The remittitur was issued on February 21, 2023.

***Postappeal Section 1172.6 Proceedings***

Following remittitur, over the People's opposition, the trial court issued an order to show cause on appellant's petition, and an evidentiary hearing was conducted on May 3, 2024. Appellant's position was that the People had failed to establish beyond a reasonable doubt that he fired the shots that killed the victim. The People's position was that appellant's no contest plea to voluntary manslaughter and admission of personal use of the gun compelled the court to find he was the actual killer. The People asserted the court was limited to the four corners of the plea form, which the court rejected, finding the trial transcripts were relevant.

The court indicated it had reviewed the trial transcripts because they made up the factual basis for the plea. After hearing argument, the court noted the evidence did not support an aiding or abetting or felony murder theory of murder, made extensive comments on the evidence, which is set forth *infra*, and denied the petition.

## DISCUSSION

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) "to amend the felony murder rule and the natural and probable consequences doctrine … to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

The bill also added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense, including, as relevant here, manslaughter, to seek resentencing. (§ 1172.6, subds. (a)-(c).) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order

7.

to show cause and hold a hearing to determine whether to vacate the murder or manslaughter conviction. (§ 1172.6, subds. (c), (d)(1).)

At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (*Ibid*.) "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid*.)

"[A] trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty [of murder under a still-valid theory] beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Appellant contends the evidence presented by the People failed to establish beyond a reasonable doubt that appellant was neither the actual killer, that he was a major participant in the shooting, nor that he acted with reckless indifference to human life. We focus only on appellant's arguments regarding him being the actual killer, as the court expressly found the evidence did not support that appellant was guilty under a felony murder or aiding and abetting theory and thus appeared to rely on the theory that appellant was directly liable as the actual killer/shooter. The court made the following comments on the evidence:

> "Mr. Villanueva, the victim who survived, said that the guy opened the window and yelled hey mother fuckers before he shot.… Mr. Villanueva said the shooter was as close to him as from here to [the prosecutor,] … obviously within the court area. I don't think that's as important as it will become later because we do have a description of the defendant…. Kevin Hawk, a police officer … found 9 shell casings at the crime scene. Said they were all generally the same…. They were all .22 caliber casings. They were all … Remington. A firearm was located in the same residence as the defendant was a Rugor MK2 handgun. It was a .22 caliber semi-automatic…. Officers found in the defendant's residence where he was living, which was a different residence, .22 caliber bullets in the nightstand of the defendant's residence. These bullets were also Remington. Along with those bullets was paperwork DMV showing the address and the name for Jorge Farias…. [T]he defendant's fingerprints were found in the vehicle. The vehicle is registered to him…. There is some testimony about the rims. Maria Cor[i]a testified … [s]he has known the defendant since high school…. She identified the … photograph of the defendant's car. Said that when he came back he was acting differently…. He was acting nervous. He told her, quote … 'He fucked up, and that he was gone and stuff like that.' Unquote. The defendant did have a firearm within that time. The defendant tried to give her the firearm to hide…. He went inside her residence. The cops came. The defendant was even more nervous…. The defendant went and stripped down to his boxers, taking off his clothes…. Diana Mathias testified…. She was a criminalist with the Kern County Crime Lab with 24 years of experience…. She found the casings, the .22 caliber that were found at the crime scene matched rounds fired from the defendant's gun[]. And … she said … 'I'm absolutely certain.' … Kevin Fin[d]ley … is a detective for 13 years, interviewed Maria Cor[ia]. The defendant told her he messed up, that he was going to go away for a

9.

while, and that he wanted her to hide the gun…. Veronica Ruiz testified … that she saw the shooter. That he was a[] Hispanic male wearing sunglasses and a blue or light blue pol[o]. From the evidence, it appears there was only one shooter who fired 9 rounds from a .22 Remington, and those rounds were found at the crime scene. These were matching rounds from— the defendant also has matching rounds in his nightstand along with his DMV paperwork. The description that the Eyewitness gave the shooter matches the defendant. And after reviewing the trial transcript, there was no evidence presented of a felony murder rule. There was no evidence of aiding and abetting. The two versions are either the defendant was the shooter or the defendant's version he was not even there at all. In fact, he knew nothing about it, that he was on his cell phone going what happened? Did he run? Did they sho[o]t at him? And he wasn't the shooter. So this was not a case where the liability was deciding on aiding and abetting or felony murder. This was a case where the question who was the shooter. Was he the shooter or was Mr. Cisneros the shooter? And the defendant was interviewed both audio and video. And … his statement is 'I'm going to say one thing. I'm not a gangster. If what I did because of some very personal things because I don't like others messing with my family.' I'll paraphrase. That is a fairly legality [sic] statement. He mentioned his mom always worked in the field. And then he said … 'I did what I did so I could defend my family members, but I don't belong to any gang.' Later at the trial the defendant testified … and he said, 'I didn't—I never wanted to say that statement.' … The defense appeared to be it wasn't me, and I wasn't there, and therefore he's not eligible for resentencing."

The court's comments indicate it made an implied finding that appellant was guilty of murder/attempted murder as the actual killer. Such a finding was supported by the evidence methodically laid out by the trial court, and we have little else to add. The court could easily find appellant was the actual killer based on the above. The facts that the shooting took place from appellant's vehicle and that appellant matched the description of the shooter, made incriminating statements to Coria following the shooting, had possession of the gun used in the shooting and made attempts to hide it, and made another incriminating statement to law enforcement following his arrest all sufficiently support the court's finding beyond a reasonable doubt.

Appellant's arguments to the contrary appear to ignore our standard of review and merely point to the evidence that he believes supports his innocence. He argues: (1) no

10.

one identified him specifically as the shooter; (2) witnesses identified the suspect vehicle as having rims; (3) law enforcement's handling of the investigation was "dismal" as they did not pursue gunshot residue or DNA evidence that may have exonerated him; (4) appellant had no motive to commit the crime; and (5) "[t]he fact that he was arrested while at Coria's home, and a gun was located in the kitchen of the home is an unfortunate coinciden[ce], but it is just that—a coincidence."

We first note none of appellant's arguments are persuasive as raising reasonable doubt. Circumstantial evidence pointed to appellant's identity as the shooter, and the prosecution was not required to submit gunshot residue, DNA evidence, or a motive. Appellant's claims that a different vehicle may have been used in the commission of the crime and that a gun being found in the residence where he was arrested was a "coincidence" are particularly weak points given that appellant's account of events support that the vehicle used in the commission of the crime was his vehicle, and that he hid the gun, which was established by forensic evidence to have fired the casings found at the scene.

In any event, appellant has done no more than request that we reweigh the evidence, which we are not permitted to do. "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We must uphold an order that is supported by substantial evidence even if substantial evidence to the contrary also exists. (*Howard v. Owens Corning* (1999)

11.

72 Cal.App.4th 621, 631.) The standard is the same even when the evidence is circumstantial.[2] (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

For the first time in his reply brief, appellant contends the issue is whether the court applied the proper standard of proof, as the court did not "specifically state that it determined beyond a reasonable doubt that [appellant] had the degree of culpability now required for a murder conviction." We do not consider points raised for the first time in a reply brief absent a showing of good cause. (*People v. Mickel* (2016) 2 Cal.5th 181, 197.) Recognizing this, appellant requests we consider the issue because "justice requires it" because "all parties involved, including those persons seeking relief under [section] 1172.6 as well as reviewing courts, should be entitled the assurance that the correct standard of review was applied." To support this assertion, appellant cites *People v. Norwood* (1972) 26 Cal.App.3d 148, 152, a case which generally notes that an appellate court may order supplemental briefing on an error not raised by the parties if "justice requires it." Appellant notably did not give any reason for his failure to present the argument in his opening brief and, as such, we find he has not established sufficient good cause justifying our review of the issue and find this argument forfeited.

Even if we were to consider appellant's argument, however, we would find no error. "In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) While the court did not explicitly mention the beyond a reasonable doubt standard, appellant has not cited anything in the record that demonstrates the trial court applied the incorrect standard of review to overcome the presumption that the trial court applied the

---

[2]     To the extent that appellant may be suggesting we apply an independent standard of review or any standard less deferential than substantial evidence, we reject this argument. We observe we still apply the substantial evidence review even when the trial court makes its findings based on a cold record. (See *People v. Underwood* (2024) 99 Cal.App.5th 303, 313–314 [listing cases where various appellate courts have "uniformly" rejected this argument].)

correct law.  To the contrary, appellant's trial counsel set forth the proper standard in his briefing and the court's comments regarding there being no evidence that appellant was guilty of aiding and abetting and felony murder taken together with the court's comments on the evidence gives us no indication that the court did not understand it was required to find appellant was the actual killer beyond a reasonable doubt and indeed did so.  The court discussed some of the evidence proffered by the defense but appeared to put more weight on appellant's postarrest statements.  This was reasonable, and we have no reason to disrupt the court's findings.

For the above reasons, we find no error.

## **DISPOSITION**

The order denying appellant's petition for resentencing is affirmed.

DE SANTOS, J.

WE CONCUR:


MEEHAN, Acting P. J.


SNAUFFER, J.

13.